**FIRST NAT. BANK OF MIAMI et al. v. VANTAGE MINING CO. et al.**

No. 14908—Opinion Filed Sept. 16, 1924.

Rehearing Denied Dec. 16, 1924.

**Banks and Banking—Contracts By Officers Against Public Policy.**

D., president of a state bank, in making a loan of $18,000, funds of the bank, to C. to make the cash payment upon the purchase price of the controlling shares of a mining company, entered into an oral agreement with C., without the knowledge of the other executive officers of the bank, by the terms of which it was agreed that for the personal profit of D. in making the loan and his further agreement to protect C. against call for payment until the shares of stock so purchased should earn sufficient dividends to pay the full purchase price and interest, including $28,500 deferred payments, that C. would transfer to D. 150 shares of the capital stock of the mining company, and D. complied with his part of the agreement. Held, such contract is against public policy and is unenforceable.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Ottawa County; H. L. Shannon, Special Judge.

Action by First National Bank of Miami, a corporation, and others, against Geo. W. Dixon, Vantage Mining Company, C. B. Clapp, W. W. Ennis, and R. P. Sharpe. Defendant Dixon filed cross-petition against the other defendants. Judgment for the defendants Vantage Mining Company, C. B. Clapp, and W. W. Ennis, and the plaintiff and cross-petitioner, Dixon, have appealed. Affirmed.

Kornegay & Probasco, Vern E. Thompson, Clyde Morsey, Robson & Bayless, and D. H. Wilson, for plaintiffs in error.

A. C. Wallace and Haywood Scott, for defendants in error.

Opinion by RAY, C. This suit is by a number of judgment creditors of George W. Dixon, former president of the Miami State Bank, for the discovery of assets and an accounting. The Vantage Mining Company, C. W. Clapp, W. W. Ennis, and R. P. Sharpe were joined as defendants. It is alleged that Dixon entered into a joint adventure with Clapp, Ennis, and Sharpe for the purchase of the controlling interest of the Vantage Mining Company, and that, as a result of that adventure, profits had accrued to Dixon which were being held by Clapp and the mining company. Dixon answered admitting the correctness of the judgments, and, by cross-petition against the other defendants, pleaded an oral contract with Clapp, Ennis, and Sharpe and prayed that he be adjudged to be the owner of 151 shares of stock of the Vantage Mining Company and the dividends accrued and accruing thereon, and that so much thereof as necessary be applied to the satisfaction of the judgments. The other defendants answered the petition, and the cross-petition of Dixon, by general denial and pleaded the statute of frauds. The court, at the request of the parties, made special findings of fact and conclusions of law. The findings of fact, which are sustained by the evidence, are, in substance, that on the first of July, 1919, C. W. Clapp bought 751 shares (a controlling interest) of the stock of the Vantage Mining Company for which he agreed to pay $18,000 cash, and $28,500 in deferred payments, $3,000 in 90 days and $3,000 each 30 days thereafter except the last payment which was $1,500. Clapp borrowed from Dixon, of the funds of the bank, the $18,000 necessary to make the cash payment for which he executed two notes to the Miami State Bank, one for $8,000 due 90 days from date, secured by 148 shares of stock of the Vantage Mining Company which was carried by the Miami State Bank as a part of its assets. The other note was for $10,200 due 90 days from date, secured by 100 shares of the Moberly, Missouri, State Bank, of the book value of $22,500. This note was immediately indorsed, without recourse, to Dixon, and then indorsed by Dixon and transmitted to a bank in Kansas City, where Dixon had a credit, for discount. At the time the loan was made it was agreed between Clapp and Dixon that if Dixon would make the loan and protect Clapp against call for payment until the dividends accruing upon the 751 shares were sufficient to make the deferred payments of $28,500, interest, and costs of purchase, and sufficient to pay the $18,000 and interest, that Clapp would transfer to Dixon 150 shares of the stock of the Vantage Mining Company. This agreement between Clapp and Dixon was made without

the knowledge of the other officers of the Miami State Bank. The $10,200 note was never carried as a part of the assets of the Miami State Bank but was renewed from time to time through the Miami State Bank and indorsed by Dixon, or someone for him, and held by the Kansas City Bank for more than a year but, upon the last renewal, was discounted by the Miami State Bank to a bank in Muskogee which required Clapp to pay the note in January, 1921. The $8,000 note was renewed from time to time and carried by the Miami State Bank until about April, 1921, when Dixon, who was then no longer connected with the bank, for the purpose of carrying out his agreement with Clapp, induced his wife to buy it. She carried this note until paid by Clapp through the Miami State Bank where she had placed it for collection. In this manner Dixon substantially complied with his agreement with Clapp. The accumulated dividends upon the 150 shares, which Clapp agreed to transfer to Dixon, are sufficient to satisfy the judgments against Dixon.

The trial court concluded as a matter of law that the contract between Clapp and Dixon contravened public policy and was, therefore, unenforceable, and entered judgment for the defendants Clapp, Ennis, and the Vantage Mining Company. From this judgment the plaintiffs, interveners, and the defendant and cross-petitioner, Dixon, have appealed.

It is argued by plaintiffs in error that this was a completed contract, and numerous authorities are cited which hold that where an illegal contract has become a completed contract that one of the parties will not be permitted to hold the profits to the exclusion of the other. With the contention that this is a completed contract, we cannot agree. While Dixon had substantially complied with the contract, Clapp had complied with no part of it but, on the contrary, had refused to do so. If Clapp had transferred the shares of stock as he had agreed to do it would have been a completed contract. In such case, after a transfer of the shares, he would not have been permitted to withold the profits but would have been required to account, for the reason that it would not have been necessary to prove the illegal contract. These creditors stand in the shoes of Dixon. Their right to recover depends upon Dixon's right to recover. They cannot recover simply because dividends have accrued sufficient to pay the judgment. Dixon's suit on his cross-petition is, in effect, a suit for the specific performance of the contract, and, in an action for specific performance, the whole contract is before the court for consideration. For this reason we think the authorities cited are not applicable.

Is this an enforceable contract? We think not. In seeking the source of public policy, as it affects this case, it is unnecessary to look beyond the banking law of this state. In the public interest banking in this state is regulated by law with a bank commissioner to see that the laws are complied with. The law provides that no bank shall employ its monies, directly or indirectly, in trade or commerce, by buying or selling goods, chattels, wares, or merchandise. No active managing officer of any bank is permitted to borrow, directly or indirectly, money from the bank with which he is connected. It is the duty of the board of directors to remove any officer of the bank found by the bank commissioner to be dishonest, reckless, or incompetent. The managing officers of every bank are required to make at least four reports each year to the bank commissioner, and making false reports is made a felony. It is contended by plaintiffs in error that, in making the loan to Clapp, Dixon did not agree to lend the money of the bank but only agreed to secure the money for Clapp by the use of his credit; but the fact remains that he secured the money directly from the bank of which he was president and at least $8,000 of the money lent is conceded to have been the money of the bank. The other $10,200 was first advanced by the bank and reimbursed by discounting the note to a bank in Kansas City. That note finally came back to the bank, and, after Dixon was no longer connected with it, was discounted to a bank in Muskogee and by that bank finally collected. When Dixon, as an executive officer of the bank, in carrying out his agreement with Clapp to lend him the money and, as a consideration therefor, in addition to the interest to be received by the bank, was to receive 150 shares of the Vantage Mining Company for his personal profit, he was, in effect, employing the monies of the bank in securing for himself, as his personal profit, the 150 shares of stock and the dividends that might accrue. It is clear to us that this transaction could not have stood the test of being reported to the bank commissioner in one of the bank's reports. What must have been the action of the bank commissioner if this transaction had been reported in its entirety while the bank was in existence? That report, if truthful, would have shown that one of the executive officers of the bank, to wit, the president, had entered into a private agreement with the purchaser of a

majority stock in a mining corporation by the terms of which he had lent $18,000 of the bank's money for a period of 90 days with an agreement to 'protect that loan against call for payment until the production of the mine had paid the entire purchase price, and that, in consideration therefor, he was to receive for his personal profit one-tenth of the capital stock of the mining company, together with its accumulated dividends, and, that in order to make the loan from the funds of the bank it was necessary to take two notes so that one could be indorsed and discounted in other banks in order to make it appear that the banking laws had not been violated by lending a greater sum to one man than the law permitted. That limitation on the amount which may be lent to one person was for the protection of the bank in the interest of the public. Could the bank commissioner have approved such report as showing that the bank was being operated as required by law, or would he have been compelled to make such finding as to dishonesty, recklessness or incompetency as to have required the board of directors to remove him from the office of president? The position of the executive officer of a bank is one of trust. The public welfare is so intimately connected with the welfare of the banking institutions of the country that the strictest fidelity to that trust is required. It is not important that the bank lost nothing by the transaction.

"The question whether a contract is against public policy must be determined by its purpose and tendency and not by the fact that no harm in fact results from it." 6 R. C. L. 707.

We think the contract upon which plaintiffs in error rely is against public policy and not enforceable. The judgment should be affirmed.

By the Court: It is so ordered.