KNOX GLASS BOTTLE COMPANY, INC. *v.* UNDERWOOD, et al.

| No. 40163 | October 8, 1956 | 89 So. 2d 799 |

700

704

705

706

January 14, 1957 91 So. 2d 843

*Butler, Snow, O'Mara, Stevens & Cannada,* Jackson, for appellant.

708

709

710

*William Harold Cox,* Jackson, for appellees, C. R. Underwood, Mrs. Florence P. Underwood and Miss C. Alberta Luter.

*Vardaman S. Dunn,* Jackson, for appellees, W. E. Hester, E. F. (Dick) Underwood and E. F. Underwood, Trustee.

714

716

717

718

ETHRIDGE, J.

This is a suit in equity by a corporation against four of its former officers and directors, and against the wife and three grandchildren (and their trustees) of an officer and director, and against a partner of an officer and director, to recover large personal profits which the defendants made from leases of trucks to complainant corporation, while certain defendants were its directors and officers. It originated in the Chancery Court of the First Judicial District of Hinds County. Although the lengthy record of sixteen volumes and the briefs involve a multitude of facts and points, the pertinent controlling principles of law are well established. The chancery court rendered a decree for defendants, appellees here.

We hold that the defendants (as individuals and two as trustees), except Hester and the three minor defendants, are liable severally for the net profits received by them after the death of Roy R. Underwood, the former president of both complainant corporation and its parent company, and that the three defendants who were directors and officers during this period of time are jointly and severally liable for the profits received by all defendants, except Hester, in the manner and to the extent hereafter set forth.

I.

The complainant is Knox Glass Bottle Company, hereinafter referred to as Knox of Mississippi. It is a Mississippi corporation engaged in the manufacture and sale of glass bottles. It operates two manufacturing plants in Rankin County, Mississippi, near the City of Jackson, one plant in Palestine, Texas, and one plant in Gas City, Indiana. All of its capital stock, except five

qualifying shares for its five directors, is owned by Knox Glass Bottle Company, a Pennsylvania corporation, hereinafter referred to as Knox of Pennsylvania, having its principal place of business at Knox, Pennsylvania. All of the capital stock of Knox of Pennsylvania is owned by approximately 160 to 220 individual shareholders.

Roy R. Underwood was a director and president of Knox of Mississippi from 1933, the date of its organization, until his death in an automobile accident on October 16, 1951. In 1934 Roy R. Underwood became president of Knox of Pennsylvania, and served also in that capacity until his death in October 1951. Roy R. Underwood owned slightly less than one-third of the outstanding shares of stock in Knox of Pennsylvania. He was a strong executive, experienced in the glass business, and the Board of Directors of Knox of Pennsylvania placed upon him the primary responsibility for supervising and directing the several plants in the northern states owned by Knox of Pennsylvania, and the four glass manufacturing plants owned and operated by its subsidiary, Knox of Mississippi. On March 26, 1934, the Board of Directors of Knox of Pennsylvania gave Roy R. Underwood, its president, a general proxy to "represent this company and vote stock owned by this company at any shareholders' meeting called by any company in which the Knox Glass Bottle Company of Pennsylvania owned stock, and such power of attorney to continue in full force and effect until rescinded by the Board of Directors of this company." This general proxy to vote stock of Knox of Pennsylvania was reaffirmed by its Board of Directors in 1942 and in 1947. After C. R. Underwood became president of both companies in October 1951, the Board of Directors of Knox of Pennsylvania gave him a similar power of attorney to vote the stock owned by that company.

During the period of time involved in this litigation, the defendant C. R. Underwood, a brother of Roy R.

Underwood, was an officer and director of the complainant, Knox of Mississippi. Prior to the death of Roy in October 1951, C. R. Underwood was vice-president and general or plant manager of Knox of Mississippi. He was in active management and control of complainant, subject to the orders of Roy. After the death of his brother, Roy, C. R. Underwood became a director in, and the president and general manager of, both Knox of Pennsylvania and Knox of Mississippi. He resigned as president of both companies on November 26, 1953. He was removed as general manager and as a director of both companies after a proxy battle with another group of stockholders in Knox of Pennsylvania, on December 1, 1953.

The defendant E. F. Underwood is a son of C. R. Underwood. He was a director in and vice-president of complainant corporation from April 17, 1939, until his resignation in November 1953. He also served during parts of this period as treasurer, assistant secretary, and assistant general manager. E. F. Underwood was a director of Knox of Pennsylvania for a portion of the time involved in this litigation, from March to November 1953.

Another defendant and son of C. R. Underwood is J. H. Underwood, who was a vice-president of complainant corporation from March 1, 1952 until November 1953, and a director from May 1952 until November 1953. J. H. Underwood was also a trustee under a certain instrument of trust created by C. R. Underwood for the benefit of defendant Sandra Ann Underwood, the minor daughter of J. H. Underwood. E. F. Underwood was also the trustee of a trust created by C. R. Underwood for his other grandchildren, Mary Ann Underwood and E. F. Underwood, Jr., defendants, the minor daughter and son respectively of E. F. Underwood.

The defendant Mrs. Florence P. Underwood is the wife of C. R. Underwood. Defendant C. Alberta Luter is and was the confidential, personal secretary and close per-

sonal friend of the defendant C. R. Underwood. She was a director and secretary and assistant treasurer of Knox of Mississippi from July 26, 1941, until January 23, 1951. From April 4, 1934 until July 26, 1941, she was assistant secretary and assistant treasurer of complainant. The defendant W. E. Hester, Jr. was a partner of defendant E. F. Underwood, doing business under the partnership name of Hutco, which partnership, along with the other defendants, owned and leased certain motor vehicles to Knox of Mississippi. Hester was also an officer and director of Motors, Inc., a Mississippi corporation, which operates a distributorship of trucks, tractors and trailers near the City of Jackson. Motors, Inc. has been controlled by the Underwood family for a number of years. Its plant is located on property purchased from the Flowood Corporation, of which C. R. Underwood is president and C. Alberta Luter is an officer.

In brief, there are eleven defendants, as individuals and in a representative capacity. Four of them, C. R. Underwood, his sons, E. F. and J. H. Underwood, and C. Alberta Luter are former officers and directors of complainant corporation. Defendant Hester is a partner of one of the officers and directors, E. F. Underwood, and Florence P. Underwood is the wife of one of them. The other three defendants are grandchildren of C. R. Underwood, who created trusts for them into which were directed proceeds of some of the truck rentals paid by the corporation. The fathers of these minors, E. F. and J. H. Underwood, were made defendants as trustees and natural guardians of them.

The gist of this action is that during the time the Underwood family was in control of Knox of Mississippi, they and their close personal friends and associates, and members of their family, leased to the complainant corporation large trucks which were used to haul glass bottles and other related products, and other commodities on some of the back-hauls; that these officers and direc-

tors, the members of their family, and their friends and business associates, while such officers and directors occupied a fiduciary relation to the appellant, made large personal profits by leasing trucks to the corporation, in contracts wherein the said defendants represented both the corporation on one side and themselves on the other. The bill of complaint charged that such profits represented an unjust enrichment obtained by defendants in violation of their fiduciary duties to the corporation, asked for an accounting for such profits, and for a decree directing their repayment to complainant.

The principal defenses raised in the pleadings and the evidence are: (1) All of the facts in regard to the truck leases and their operations were reported to Roy R. Underwood, who was the President of Knox of Pennsylvania and Knox of Mississippi until his death in October 1951, and Roy, representing the Pennsylvania corporation, which owned all of complainant's stock, had established a definite policy that the company should not make capital investments by buying trucks but should lease them, and C. R. Underwood and the other defendants who were officers and directors were acting pursuant to this direction by the executive and policy-making head of both companies; (2) Knox of Pennsylvania, through Roy, its directors and stockholders, had full knowledge of all the facts concerning the truck-leasing contracts, by regular, periodic "clipper reports" of trucking operations made by Knox of Mississippi to the President of Knox of Pennsylvania, and the directors and stockholders of Knox of Pennsylvania, acting through their President Roy R. Underwood, authorized such leases, and ratified and approved them; (3) After Roy's death in October 1951, when C. R. Underwood became president and a director of both companies, serving in those capacities through November 1953, the Pennsylvania company was in bad financial condition and used all of complainant's available capital to finance investments in

the northern plants of the parent company; therefore, complainant corporation was never able to make capital investments in trucks, and the decision of the defendants who were directors of complainant not to buy but lease trucks was a matter of business judgment; (4) the truck leases and rentals were fair and equitable, resulted in benefits to complainant corporation, and cost it less than transportation by common carriers; and (5) the defendants acted honestly and in good faith in entering into these lease agreements and in all of their dealings with and on behalf of the corporation.

Knox of Mississippi is governed by a board of five directors. From 1941 until April 1948, it consisted of Roy R. Underwood, who lived in Knox, Pennsylvania; C. R. Underwood, the younger brother of Roy Underwood, and the vice-president and general manager; C. R.'s son, E. F. Underwood; Miss C. Alberta Luter, and L. D. Richardson, a resident of Pennsylvania. The board members who resided in the Jackson area were C. R. and E. F. Underwood, and Miss Luter. Except that J. T. Helsel, a resident of Pennsylvania, was substituted for Richardson, the board continued with this set-up until January 3, 1951, at which time Miss Luter was dropped from the board and Malcolm Lowe was elected in her place. Helsel, Lowe and Luter were salaried employees. Since Roy R. Underwood lived in Knox, Pennsylvania, he came to Mississippi only infrequently. C. R. Underwood, Vice-president and General Manager of Knox of Mississippi, lived in Jackson, and was the officer in active control and direction of Knox of Mississippi. Immediately under C. R. Underwood was the defendant E. F. Underwood, who was vice-president, assistant general manager, and a member of the board of directors of Knox of Mississippi. In other words, as E. F. Underwood testified, during this period he and his father "were the main spokes in the wheel" of Knox of Mississippi.

After Roy R. Underwood died in October 1951, and C. R. Underwood moved to Knox, Pennsylvania to serve as President of both Knox of Pennsylvania and Knox of Mississippi, G. B. Underwood, a nephew of C. R. Underwood, was elected to complainant's board of directors in Roy's place. This continued until May 5, 1952 when J. H. Underwood, a defendant and another son of C. R. Underwood, replaced Helsel, and thereafter until December 1953 the board of directors of the Mississippi corporation consisted of C. R. Underwood, his two sons, E. F. and J. H. Underwood, his nephew, G. B. Underwood, a nonresident of Mississippi and upon whom no process was obtained in this suit, and Malcolm Lowe, an accountant who was a salaried employee of Knox of Mississippi.

C. R. Underwood and his nephew, G. B. Underwood, became members of the board of directors of Knox of Pennsylvania on October 18, 1951, after Roy's death. Defendant E. F. Underwood was elected vice-president and a member of the board of directors of Knox of Pennsylvania on March 3, 1953, and on the same date, G. B. Underwood became executive vice-president. On March 4, 1952, C. R. Underwood's nephew, F. C. Hicks, upon whom no service of process was obtained in this case, since he was a nonresident of Mississippi, became vice-president. On March 3, 1953, Hicks was elected secretary of Knox of Pennsylvania. In the November 1953 proxy battle with the Victor T. Norton group, all of the Underwoods were ousted from the board of directors of Knox of Pennsylvania as well as Knox of Mississippi, except E. F. Underwood was retained as a member, but he resigned on April 24, 1954.

In brief, although Roy R. Underwood was the top policy-making executive of the Knox group, it is apparent that the detailed day-to-day operations of Knox of Mississippi were delegated to his brother, C. R. Underwood, E. F. Underwood, and Miss Luter, who served as officers

of Knox of Mississippi. Roy received regular reports of these operations, but the defendants who were officers and directors of the corporation (especially C. R. and his son E. F. Underwood) were the "main spokes in the wheel" in the operation of Knox of Mississippi. Certainly the complainant corporation was run by the Underwood family and their close personal friends and associates. For example, from July 26, 1941, to January 23, 1951, there were sixty-one meetings of the board of directors, and the only persons present at fifty of these were C. R. and E. F. Underwood and Luter. They also attended the remaining meetings held during this period. The only meetings attended by Roy were the annual stockholders' meeting and the organizational meeting of the board of directors held immediately following it.

Knox of Mississippi sold the glass containers manufactured by it mostly in the southern part of the nation. In 1944 and 1945 the corporation purchased four tractor and trailer units (which for brevity will hereafter be referred to as "trucks") in order to deliver manufactured products to customers, and to bring back to the plant raw materials such as sand and cullet, or broken or scrap glass. These and the other trucks owned and leased by the corporation were given numbers, such as truck No. 1, 2, 3, and up to No. 30. In 1946, J. G. and C. H. Smith, sales representatives of the corporation, at the request of C. R. Underwood, leased truck No. 5 to it. They were not officers or directors. In that year truck No. 5 lost about $2,000, but by the end of 1947 it was making an annual profit of $6,000 or more. Subsequent to 1947 truck No. 5 netted profits of $10,000 a year and more. When C. H. Smith became an officer and director of Knox on December 1, 1953, he sold the unit to Knox. Up until the middle of 1948, Knox of Mississippi was operating nine truck units, seven of which were company-owned and two of which were leased. By that time it was obvious that large profits were being made by the trucks.

For 1947, the four company-owned trucks earned a net profit without dead-head of $23,210.06. On September 8, 1948, the first truck of which complaint is made in this suit, No. 10, was leased to complainant by defendant J. H. Underwood. From December 1947 to July 1953, twenty tractor and trailer units were leased to the corporation as follows: Meridale, Inc., 1 unit; J. H. Underwood, 1 unit; Hutco, 3 units; Florence P. Underwood, 2 units; C. Alberta Luter, 4 units; C. R. Underwood, 6 units; J. W. Smith, and H. B. DeVinney, 1 unit; and G. B. Underwood, 2 units.

Under these lease agreements, the lessee-corporation paid to the lessors as rental for the motor vehicle and equipment a sum equal to the published carload freight rate on all tonnage for which the vehicle and equipment was used to transport, after first deducting from that amount drivers' wages, insurance premiums, gasoline and oil, repairs and maintenance, tires, and other deductions in connection with the use and operation of the vehicle, when approved by lessor. The lease was on a month-to-month basis, with a right in either party to terminate on thirty days written notice. In other words, Knox of Mississippi credited the lessors with the amounts of rentals earned, paid the operating expenses, outlined in the lease, and charged them to the lessors' account. The balance was paid to the lessors each month by check of the corporation. Hence payments by Knox represented net profits to lessors, after payment of all operating expenses, except depreciation and personal property taxes.

Several witnesses testified without dispute that Roy R. Underwood made all major decisions concerning the operations of the Knox plants. The evidence amply supports the chancellor's finding that the board of directors of Knox of Pennsylvania, which owned all of the stock in Knox of Mississippi, did not question Roy R. Underwood's judgment in the operation of the Knox businesses.

Roy R. Underwood decided as a matter of policy that the company should not purchase and own any trucks. He was opposed to it operating its own trucks, for the purpose of hauling its wares to its customers and making return hauls of property of others. He considered that it was preferable for the company to use its available funds in its glass manufacturing operations. After C. R. Underwood purchased clippers Nos. 7, 8 and 9 (a name applied to the tractor and trailer units), Roy, in March 1949, rebuked C. R. Underwood for violation of his instructions and policy with reference to capital investments, and instructed him to dispose of the clippers owned by the company. However, the company retained the clippers which it had purchased.

By the end of 1948, Knox of Mississippi had in operation eleven trucks, eight of which were company-owned and three of which were leased from others. From 1948 up until 1953, during the period the Underwoods, who were officers and directors, were in control of the Mississippi corporation, Knox of Mississippi placed in operation nineteen additional units. Of these, seventeen were put on by C. R. Underwood, members of the Underwood family, and Miss Luter. Other persons, not members or friends of the Underwood family and not directors and officers of complainant, sought on several occasions to lease additional trucks to complainant, but were denied the opportunity. A summary of the number of truck leases made during the period in question is given subsequently.

The overwhelming weight of the evidence shows that the Underwoods and their close personal friends and business associates fully availed themselves of the profitable opportunity of leasing trucks to the corporation. J. H. Underwood in 1948 leased one truck. In 1949, Hutco leased two trucks. In 1949, Florence P. Underwood, the wife of C. R. Underwood, leased one truck.

In 1949, Miss Luter leased two trucks, and in 1950, two others. The 1950 leases were made by Miss Luter to the corporation after a shortage in Miss Luter's accounts of $24,775.91 was discovered in October 1949 by accountants. After this shortage was revealed, C. R. Underwood borrowed personally $25,000, and paid the amount of the shortage to Knox of Mississippi. In January and February 1950, he arranged for Luter to lease two more trucking units to Knox of Mississippi. From these two trucks alone in 1950, Luter received in excess of $27,000 from the corporation as net rental payments. She then paid C. R. Underwood the amount which he had borrowed to make up her shortage, and Underwood repaid the personal loan which he had obtained.

In 1950, C. R. Underwood leased two trucks to the corporation, and his wife one. In 1951, he leased two other trucks to the corporation, and in 1953, after Roy's death and while he was serving as president of both Knox of Mississippi and Knox of Pennsylvania, C. R. Underwood leased two other trucks to Knox of Mississippi. In 1953, G. B. Underwood leased two trucks to the corporation.

In January 1952, after Roy's death, C. R. Underwood transferred his trucks Nos. 24 and 25 to E. F. Underwood as trustee for E. F. Underwood's two children, C. R.'s grandchildren, and also transferred truck No. 22 to his son, J. H. Underwood, as trustee for his minor child, C. R.'s grandchild. The purpose of these transfers to the trustees of C. R. Underwood's grandchildren was to build up an estate for them out of the profits and earnings from the trucks. The trustees had no funds in the trust estates. They paid for the trucks out of the net rentals paid by Knox of Mississippi to the trustees. When he made these transfers, it is clear that C. R. Underwood knew that the trustees would be able to pay him for these three trucks out of the rentals that they would receive in about seven months' time. And, of course, during this period, C. R. was president of both complain-

ant and Knox of Pennsylvania. Roy was dead. Moreover, when the leases were made to complainant by Luter, Hutco, Mrs. Florence P. Underwood and other members of the Underwood family in 1949 through 1953, C. R. Underwood and the lessors, who were officers and directors, or their associates, knew that the net rentals from the trucks would pay off their purchase prices within five to ten months, and that thereafter the rentals, except for depreciation and personal property taxes, would be clear profit.

With the exception of three leases which were signed for the corporation by Malcolm Lowe, all of the truck leases to Knox of Mississippi were signed for the corporation by one of the three defendants who were directors and officers, C. R., E. F. and J. H. Underwood. In instances where one of these directors and officers would make a lease to complainant, one of the others would sign the lease on behalf of the corporation.

Over the period of time in question, from 1948 through October 31, 1953, defendants, and C. R. Underwood's nephews, G. B. Underwood and F. C. Hicks, were paid $1,054,519.41 as net revenues after deduction of operating expenses by Knox. After the further deduction of estimated depreciation at a rate of 25 percent per year, the defendants and the two nephews over this period of time earned a net profit of $890,305.43, allocated as follows:

| | |
|---|---:|
| C. R. Underwood | $139,515.91 |
| G. B. Underwood | 8,892.08 |
| E. F. Underwood, Trustee | 46,158.29 |
| J. H. Underwood | 95,700.89 |
| J. H. Underwood, Trustee | 24,155.33 |
| Florence P. Underwood | 103,854.41 |
| F. C. Hicks | 18,863.63 |
| C. Alberta Luter | 191,101.52 |
| Hutco | 262,063.37 |
| Total | $890,305.43 |

Defendants contend that a proper rate of depreciation is 33⅓ percent per year, over a three-year period, rather than 25 percent over a four-year period. Assuming this contention is correct, and we do not decide this question now, then the amount of net profits received by defendants would be reduced somewhat from the figures set forth herein.

Roy R. Underwood died in October 1951. C. R. Underwood then became president of both Knox of Pennsylvania and Knox of Mississippi, and was the principal executive officer of these corporations. From January 1, 1952, until October 31, 1953, defendants received net truck rentals of $499,116.51. After deduction of operating expenses and estimated depreciation at the rate of 25 percent per year, defendants and the two nephews received a net profit subsequent to January 1, 1952, of $415,413.93, allocated as follows:

| | |
|---|---:|
| C. R. Underwood | $ 29,716.53 |
| G. B. Underwood | 8,892.08 |
| E. F. Underwood, Trustee | 46,557.99 |
| J. H. Underwood | 48,152.72 |
| J. H. Underwood, Trustee | 24,885.76 |
| Florence P. Underwood | 47,870.94 |
| F. C. Hicks | 18,863.63 |
| C. Alberta Luter | 82,171.03 |
| Hutco | 108,303.25 |
| Total | $415,413.93 |

The following procedure was adopted under the leases in regard to all of the leased trucks: Employees of Knox of Mississippi supervised the operation, the routing and the repairing of leased trucks, and hired the drivers, except as to the soda-ash truck, No. 12. The corporation provided all storage and terminal facilities, handled all problems and costs of traffic and safety, except cost of liability insurance, planned all the truck move-

ments, and arranged for all back-hauls, hereafter discussed, and directed and supervised all of the operating and maintenance personnel. The corporation did all of the bookkeeping necessary in order to keep detailed records on each truck's movements, the revenues of the trucks, and the classes and amounts of expenses.

A. N. Morgan, a certified public accountant, with experience in regard to truck operations, was a witness for complainant. He testified that there were several reasons why the truck operations were so profitable. The regularity of the need for transportation in a stabilized quantity permitted the management to determine the most economical number of units needed, assuring continuous and regular usage. The situation of the sources of needed raw materials and the location of customer outlets for finished products enabled efficient utilization of truck movements. The finished products manufactured by complainant were readily adaptable to movement by truck. Moreover, as detailed above, Knox of Mississippi, as lessee, furnished most of the services and facilities which other carriers had to furnish out of their own management and funds, and in effect, supplied the same at no cost to the trucking operation. In addition to storage and terminal facilities, traffic and other problems, planning all truck movements and arranging for backhauls, the corporation negotiated for and arranged schedules for outside miscellaneous backhauls of such commodities as fruits and vegetables, all of the revenue from which was turned over to the truck owners. Complainants' employees also supervised all operating and maintenance personnel, and did the necessary bookkeeping. Hence Morgan said that the set-up was a "natural" for a company-owned trucking operation. It should be noted that everything connected with the operation other than the bare ownership of the trucks was the property and responsibility of Knox of Mississippi. The lease agreements had no provision for the back-hauling of agricul-

tural and other products for third persons for hire. However, this source of income was utilized by complainant for the benefit of the lessors. Profits on back-hauls were credited by complainant, under the management of the defendant officers and directors, to the accounts of the owners and lessors of the equipment. However, a substantial part of the profits from the back-hauls were obtained from the transportation of complainant's own property, such as interplant ware transferred from one plant to another, and cullet and cartons bought by complainant.

The leased trucks which were originally bought by the lessors and leased to the corporation were purchased with small down payments, and the balance of the purchase price, as well as the down payments, were paid off in full from net rental profits from the trucks in periods ranging from five to ten months. Most of the trucks, such as the three transferred to trustees for C. R. Underwood's grandchildren, were paid for in toto out of the net rentals on the trucks within five to ten months.

■■■ Appellees contend and the chancellor found, erroneously we think, that the leases were in fact beneficial to the corporation; and that by getting a rate schedule on carload freight rates, the lessee complainant saved a large amount of money over the period of time in question. For the first nine months in 1953, for the Jackson plant, 40.23 percent of the complainant's merchandise was shipped by leased clipper trucks. Customers came and got 41.29 percent of the company's output; 7.42 percent was shipped by company-owned clippers; 6.76 percent was shipped by rail; and 4.30 percent was shipped by motor freight during the period in question.

Throughout the history of the company, the ratio between its gross sales and its freight charges has remained substantially constant. The freight charges have amounted to about 12.29 percent of the complainant's gross sales.

However, A. N. Morgan, certified public accountant, made a study of the truck operations at Knox of Mississippi, and compared their operating revenues and costs with public contract carriers operating in the southern region. The result of this study reflected that the net profit on gross revenues earned by company-owned and by leased trucks was approximately 33.03 percent of such revenue. In other words, of every dollar received by Knox of Mississippi's own trucks and by leased trucks, 33.03 percent was profit. On the other hand, contract carriers operating in the southern region earned a profit of 6.23 percent of the amount of revenue received. Morgan testified that the latter figure was arrived at by public contract carriers dealing at arm's length with business men representing an industry which had a product to transport. Such public contract carriers had arrived at tariffs which permitted them to make a return on the gross volume of revenue of from 5 to 7 percent. There were no arm's length negotiations at Knox of Mississippi with respect to the leased trucks. It is undisputed that the defendants, who were officers of the corporation, made no attempt to obtain more favorable trucking contracts for the corporation. Hence, on the leased trucks operating for complainant, a net return was earned of about 33.03 percent per annum on gross revenue. The leased trucks produced a far greater profit than was being made by public contract carriers in this southern region. It is undisputed that complainant did not receive a single benefit from operating the trucks as lessee that it would not have received in operating them as the owner. So if Knox of Mississippi had owned the trucks and retained the rentals or net profits which it paid to the defendants, it would have received all benefits which it actually received from the trucking; would have owned the trucks fully paid for; and would have had several hundred thousand dollars more cash for itself.

C. R. Underwood testified that "it was obvious from the detailed reports that this company sent to the Knox office that the company should have put on trucks." However, he, E. F. Underwood and Miss Luter, and one or two other witnesses testified without dispute that Roy R. Underwood during his lifetime forbade Knox of Mississippi to operate company-owned trucks. And Roy was the undisputed executive head of both Knox of Pennsylvania and of Mississippi. After Roy R. Underwood died and C. R. Underwood became president of both the parent and subsidiary, C. R. Underwood asserts that he did not then change Roy's policy forbidding company-owned trucks because he discovered that Knox of Pennsylvania was in very poor financial condition, and was draining from the Mississippi corporation its available surplus. Knox of Pennsylvania had a large tax liability, and was operating with an overdraft of $1,555,070.80 in five different banks. In the fall of 1951, it had to borrow $3,000,000 from the Commercial Credit Company, secured by a mortgage on its assets, which provided that expenditures for capital investment in excess of its current depreciation should not be made "except with the prior written consent of the lender." However, after C. R. Underwood became president of both companies, he had the Pennsylvania corporation purchase trucks for some of its northern operations. Moreover, the chancellor correctly found that Knox of Mississippi was at all times able to buy trucks. After the new management took over, the lender agreed for Knox to purchase trucks. C. R. Underwood did not request, while he was president of the Knox companies, permission to do this. Nor did he, or E. F. or J. H. Underwood make any effort whatever to negotiate truck leases or contracts more favorable to complainant.

The evidence further reflects that Roy R. Underwood, during his lifetime and while he was president of both corporations, had full knowledge of these trucking leases.

On the other hand, it does not appear that the other directors of Knox of Pennsylvania, which owned all of the stock in complainant, or its stockholders had full or any substantial knowledge of the details of the trucking operations by complainant or the extent of profits being realized by the defendants.

The available profits and the fact that the company could have saved considerable money by either shipping by public contract carriers on a competitive basis or by owning its own trucks, is not a matter of hindsight. The record clearly shows that after the middle of 1948, C. R. Underwood and the other officers and directors of complainant had full knowledge of the large and disproportionate profits being realized by the leased trucks.

On May 15, 1953, in response to an inquiry from C. R. Underwood, Hon. P. H. Eager, Attorney for Knox of Mississippi, wrote a letter to C. R. Underwood, in which he advised that undoubtedly the lease agreements should be approved by the directors of both the Mississippi corporation and the parent corporation; and that those who were interested in the truck leases and who had benefited financially in ''highly substantial amounts are the top executive management and officers of the subsidiary Mississippi corporation.'' Eager, in the letter, pointed out that these relationships are of a fiduciary nature, and since the officers are acting on the one hand for the stockholders and on the other hand to their individual profit and gain, the corporation should be advised of the facts and have the opportunity to decide through its stockholders whether to own trucks or to continue to lease them. It was urged that this should be promptly submitted at an early meeting of the directors of the parent company. After Eager's letter of May 15, 1953, C. R. Underwood, as well as E. F. and J. H. Underwood, not only continued to lease the trucks for himself, his family, and friends, but he arranged for his nephew, G. B. Underwood, to put on two additional trucks. Prior and

subsequent to this date, the units were earning large profits, in excess of 100 percent of their cost per annum, and in the case of the soda-ash truck, more than 783 percent over a period of less than five years. Yet the defendants, who were managing officers and directors of complainant corporation, made no effort to obtain a better deal for the company with the lessors, or to negotiate more favorable leases, or to obtain competitive bids from public contract carriers.

In March of 1953, Victor T. Norton became a member of the board of Knox of Pennsylvania. He and other stockholder interests, not connected with the Underwood group, obtained proxies from about 78 percent of the stockholders, elected a new slate of directors, and ousted all of the Underwood group. Anticipating the result of the stockholders' meeting, C. R. Underwood resigned as president of the two corporations on November 26, 1953. The parent corporation operated a number of glass plants, both north and south. A reasonable time was required for the new administration to re-examine the financial and administrative condition of the parent company and its subsidiaries, and to adopt such changes in policy as the new board of directors thought proper. A month and six days after the change of administration, after complainant's new board of directors had consulted legal counsel, complainant wrote letters to the defendants repudiating the truck lease agreements, and advising that complainant did not recognize them as valid. The letter reserved the right to demand reimbursement for rentals paid the defendants, advised that the "purported" lease agreements should be terminated as of that date, and tendered immediate possession of the equipment. On February 23, 1954, complainant purchased some of the trucking equipment from the lessors. The documents, including the bills of sale signed by defendants, recited that it was agreed that the purchases were without any prejudice to complainant's rights to

maintain litigation of the present type, and that complainant reserved all rights to repudiate the leases and recover the rentals paid under them.

The opinion of the learned chancery court may be summarized as follows: The defendants, C. R., J. H. and E. F. Underwood, and Miss Luter occupied a fiduciary relation with the corporation during the periods they were officers and directors. However, the burden of proof is on complainant to show that defendants used their positions with the corporation to overreach it and its stockholders, and that through acts of bad faith they became unjustly enriched. Complainant must produce clear and convincing evidence of bad faith on the part of Roy and C. R. Underwood, and the other officers and directors, in deciding that the company should lease the trucks; and complainant had the burden of proving that the defendants were guilty of fraudulent acts in connection with the trucking operations. Complainant actually benefitted by many thousands of dollars from the operation of leased trucks at carload freight rates; the volume of business was increased thereby; and the leases were fair and reasonable. However, the trial court found as a fact that, although Knox of Pennsylvania was hard pressed for operating capital, complainant made substantial profits during the period in question, and at all times was financially able to have purchased the trucks for itself. Knox of Pennsylvania actually purchased a number of units after C. R. Underwood became its president. The trucking operation was not such a business opportunity of complainant as to "absolutely require" defendants to act upon and seize it for the corporation. It did not bring defendants in direct competition with complainant. The learned chancellor thought that whether the trucks should have been purchased or leased by the corporation was a matter of business judgment which was left by the stockholders of Knox of Pennsylvania to Roy during his lifetime, and then to C. R. Underwood. These

persons decided that the trucks should be leased. And he said that there was no clear and convincing evidence of bad faith on their part in so deciding.

The chancery court stated that the "power of attorney" given Roy R. Underwood, and later C. R. Underwood, constituted them the agents of the stockholders for notice of their action; that the stockholders of both corporations were charged with notice of the trucking operations; and that the directors and stockholders of Knox of Pennsylvania either knew or should have known about it. The chancellor said that the personal misconduct of C. R. Underwood and Miss Luter in dealing with corporate funds was clearly established, and that they "were guilty on more than one occasion of misconduct which was dishonest and highly reprehensible in their dealings with the affairs of the complainant corporation, while serving as officers and directors of said corporation;" that the evidence does not show that any of the other defendants had knowledge of such acts of misconduct and breaches of duty by these two defendants; and that such acts have no connection with the truck leases. Because complainant used the leased trucks until February 23, 1954, complainant recognized the validity of such leases and ratified them. It was stated that on the trial of the case complainant abandoned its prayer for a general accounting and a money-decree against defendants on all matters, except the trucking operations. The chancery court held that the evidence was insufficient to show that defendants were guilty of fraudulent acts in connection with the trucks, and the final decree dismissed the bill of complaint with prejudice. On the cross bills of several of the defendants, the chancery court granted judgments to Mrs. Florence P. Underwood, E. F. Underwood, as trustee for Mary Ann Underwood and E. F. Underwood, Jr., minors, J. H. Underwood, trustee for Sandra Ann Underwood, a minor, to J. H. Underwood individually, to C. Alberta Luter, to E. F. Underwood and

W. E. Hester, Jr., partners, doing business as Hutco, for rentals on trucks leased by these parties to complainant for the months of November and December 1953, and January and February 1954, with interest from the date of the decree. These party-defendants have taken cross-appeals, and contend only that the chancery court should have allowed them interest on such rentals from their due date.

## II.

In dealing with this case on the merits, certain conclusions of law and established legal principles should be stated at the outset. After that, the extent to which those principles are applicable to the present facts will be considered.

The chancery court was warranted in holding that complainant abandoned its prayer for a general accounting, and is confined to its prayer for a recovery of the profits received by defendants from the trucking operations. This is supported by the basis upon which complainant was permitted to introduce evidence of acts of misconduct by C. R. Underwood and by Miss Luter, not connected with the trucks, to show a course of dealing and intent with reference to the corporate funds, and by the contentions made by complainant in its trial brief submitted to the chancery court, as quoted in a brief of appellees, and not denied by appellant. The briefs and arguments on appeal further support this conclusion of the chancellor. This does not affect whatever rights complainant might have, if any, in another suit against defendants for any claims other than profits received from the leased trucks.

The chancery court was in error in stating in its opinion that the burden of proof was upon complainant to show by clear and convincing evidence that defendants were guilty of bad faith in making the truck leases and of fraudulent acts in connection with the trucking ventures. This is a suit to recover from fi-

duciaries profits made from contracts in which they represented both themselves and the corporation. ██ ██ Where this conflict exists, and where there is no full disclosure and ratification by or estoppel of the corporation and its stockholders, equity requires the fiduciary to account for the profits, regardless of the good faith of the defendant fiduciaries, and regardless of whether the corporation suffered any actual injury. ██ ██ Even if the ground for rescission was unfairness or bad faith, and in either circumstance, the burden of proof is on the director or officer to show its inherent fairness to the corporation. Pepper v. Litton, 308 U.S. 295, 60 S. Ct. 238, 84 L. Ed. 281; Gwin v. Fountain, 159 Miss. 619, 120 So. 18 (1930); 3 Fletcher, Corporations, Secs. 921, 913, 916; 19 C.J.S., Corporations, Secs. 783, 818. As hereinafter discussed, a distinction is made between a situation where a director deals both on the one hand for himself and on the other for the corporation, and one where a director represents himself and, on the other hand, the corporation is represented by other persons independent of the director or officer. Even if it is assumed that the latter situation should exist as to certain of the defendants, the burden of proof is upon the director or officer who seeks to uphold the transaction, not only to prove the good faith of the transaction, but also to show its inherent fairness from the viewpoint of the corporation.

██ ██ The fact that complainant's charter does not expressly authorize trucking operations does not insulate defendants from liability for profits from the truck leases, if they are otherwise recoverable. Aside from the question of whether that function was reasonably and necessarily related to its express charter powers, this contention of defendants "has been universally rejected." 3 Fletcher, Sec. 890.

██ ██ The doctrine of corporate opportunity does not apply to this case. Appellees argue that trucking was not

a corporate opportunity of Knox of Mississippi; that its business was that of making glass; and that these trucks could not have operated as they did without the revenues derived from the return haul of property of others for hire. 3 Fletcher, Cyclopedia Corporations (Perm. ed. 1947), Sec. 861.1, states: "The doctrine of 'corporate opportunity' is nothing new to the law. It is but one phase of the cardinal rule of 'undivided loyalty' on the part of fiduciaries. In other words, one who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence."

 In fine, the doctrine of corporate opportunity is a limited principle dealing primarily with the acquisition of a property interest which is adverse to that of the corporation, and to the acquisition of a property interest in which the corporation has an interest or expectancy. And of course there are limitations and exceptions to the rule of corporate opportunity. Usually where there is such a usurpation, the fiduciary buys property which the corporation needs or wants, and later sells it at a profit, or the officer or director for his own account and purposes engages in a venture similar to that which the corporation might engage in and makes a profit out of it.

 We are here concerned with whether another and much broader rule is applicable to the facts. It is undisputed that the defendant fiduciaries and their personal friends and business associates have made large personal profits at the expense of the corporation. The directors and other officers of a corporation, while not trustees in the technical sense in which that term is used, occupy a fiduciary relation to the corporation and to its stockholders. 3 Fletcher, Sec. 838; Ventress v. Wallace, 111 Miss. 357, 71 So. 636 (1916); Millsaps v. Chapman, 76 Miss. 942, 26 So. 369 (1899); Pepper v. Litton, supra.

▆▆ ▆ The following rule is well established, as set forth in 3 Fletcher, Sec. 884:

"Since the directors and other officers of a corporation, whatever their relation may be technically, occupy a fiduciary or quasi trust relation toward the corporation and the stockholders collectively, it is thoroughly well settled that they cannot, either directly or indirectly, in their dealings on behalf of the corporation with others, or in any other transaction in which they are under a duty to guard the interests of the corporation, make any profit, or acquire any other personal benefit or advantage, not also enjoyed by the other stockholders, and, if they do so, they may be compelled to account therefor to the corporation in an appropriate action.

"In other words, as stated in one case, the accountability of a director of a corporation is determined by the strict standards of rectitude that bind a fiduciary; he is not entitled to profits beyond the earnings on his stock, a proper compensation and expenses . . . . . If officers or directors make a personal profit through the use of corporate assets, they must account for it to the stockholders, and it is immaterial that their dealings may not have caused a loss or been harmful to the corporation; the test of liability is whether they have unjustly gained enrichment.''

▆▆▆ The important factor in the present case is that the interested fiduciaries have acted for and represented both the corporation and themselves in making these lease contracts. Where that occurs, it is well established that, in the absence of ratification or estoppel, and full disclosure, the transaction is voidable at the option of the corporation, without proof of actual fraud or of actual injury to the corporation. This is clearly stated in 3 Fletcher, Sec. 924:

"No principle in the law of corporations, therefore, is founded on sounder reasons, or more surely settled, than the principle that the directors, trustees or other

officers of a corporation, who are intrusted with its interests, and occupy a fiduciary relation towards it, will not be allowed to contract with the corporation, directly or indirectly or, to sell property to it, or purchase property from it, where they act both for the corporation and for themselves. In such a case, the transaction is, at the least, voidable at the option of the corporation; and it may be avoided and set aside, or affirmed and any profits recovered, without proof of actual fraud, or of actual injury to the corporation. So this rule has been held applicable to a sale by directors of their stock to the company, and to a lease of a corporation's building voted by the directors to themselves as individuals, but has been held not applicable to the declaration of a dividend by a board of directors.

" 'The reason given by courts of equity for the rule that a trustee may not sell to himself the property of the cestui que trust is that the latter is entitled to the disinterested management and judgment of the trustee, in effecting a sale, and that his self-interest must not be allowed to intervene to conflict with and probably prejudice that of his constituent.' It has also been said that 'the purpose and reason of the rule is to secure fidelity in the agent, and will not permit him to assume a position where his own private interest will tempt him to overlook or disregard the interest of his principal.' Generally, this rule is applied in case of directors but it is equally applicable to other officers."

The reasons for this rule are set forth in 3 Fletcher, Sec. 926:

"It is to be noted that the main, if not the only, difference between dealings with a corporation as dependent upon whether the officer adversely interested to the corporation acts also for the corporation in the transaction, or whether the corporation acts through other officers, is that in the former case the corporation may have the contract or other transaction set aside merely because

of the relationship of the parties and without regard to whether the corporation has been injured, or the contract is fair or unfair, or the officer has acted in good faith or in bad faith, while in the latter class of cases the weight of authority holds that in order to set the contract or other transaction aside there must be proof of unfairness causing actual injury or of bad faith of the officer or officers.''

██ ██ The same principles and distinctions are set forth in 13 Am. Jur., Corporations, Sec. 1002. It is there said that where an officer or director represents both himself and the corporation, the contract is voidable by the corporation without reference to the good faith of the defendant or whether the corporation suffered an actual injury; that fidelity in the agent is what is aimed at, and ''the law will not permit the agent to place himself in a situation in which he may be tempted by his own private interest to disregard that of his principal.'' See also Ibid., Sec. 1005. To the same effect are 2 Thompson, Corporations (3rd ed. 1927), Sec. 1328; Stevens, Corporations (1936), Sec. 143. This rule does not proscribe all contracts between a director or officer in the corporation. It simply requires that, if such a contract is made, the corporation's interest must be guarded, and it represented, by disinterested agents free from the control or influence of the interested director or officer.

██ ██ On the other hand, it is also well established that ''The right to question the dealings of officers or directors with the corporation property may be lost by ratification or acquiescence, and such right to question the dealings of officers or directors with the corporation property may be lost by estoppel, or by laches.'' 19 C.J.S., Corporations, Sec. 778(b). For cases illustrating this principle, see Brooks v. Zorn, 24 S.W. 2d 742 (Tex. Civ. App., 1929); Barrett v. Smith, 185 Minn. 596, 242 N.W. 392 (1932); Phoenix Title and Trust Company, v. Alamos Land and Irrigation Co., 24 Ariz. 499, 211 Pac. 570

(1922); modified on another ground in 25 Ariz. 103, 213
Pac. 574 (1923); Greenfield v. 5222 Harper Ave. Building
Corp., 351 Ill. App. 375, 115 N.E. 2d 357 (1953); King
v. Los Angeles County Fair Association, 70 Cal. App. 2d
592, 161 Pac. 2d 468 (1945); see also 19 C.J.S., Corpora-
tions, Sec. 763. The same text at Sec. 783 further states
that "the corporation or its stockholders may by their
acts be estopped to question the transaction." McLaugh-
lin v. Corcoran, 104 Mont. 590, 69 Pac. 2d 597 (1937);
Luitwieler v. Luitwieler Pumping Engine Co., 67 Cal.
App. 544, 228 Pac. 398 (1924); Lampropulos v. Kedzie-
Ogden Building Corp., 4 Ill. 2d 32, 122 N.E. 2d 181 (1954);
Von Herberg v. Von Herberg, 6 Wash. 2d 100, 106 Pac.
2d 737 (1940). See also 13 Am. Jur., Corporations, Sec.
1006. To the same effect is 3 Fletcher, Corporations,
Secs. 979-986; see also 13 Am. Jur., Corporations, Sec.
1022; Anno., 10 A.L.R. 370 (1921); 16 A.L.R. 2d 467, 481
(1951).

## III.

In considering and applying the foregoing principles
of law to the facts in this case, a majority of the judges,
being Judges McGehee, Roberds, Hall, Lee, Kyle and
Arrington, are of the opinion, and the Court holds, that
a distinction must be made between the rights and lia-
bilities of the parties to this suit before and after the
death of Roy R. Underwood on October 16, 1951. The
chancellor was amply warranted in his conclusion that
during his lifetime, Roy R. Underwood exercised almost
complete domination and control over the entire Knox
empire, and that "he was the person upon whom the
board of directors of Knox of Pennsylvania relied to
make the policies for the operations and to direct the
affairs of the Knox empire." In addition, he was given
a full power of attorney to vote by proxy all of the stock
owned by Knox of Pennsylvania in the Mississippi cor-
poration.

The record reflects that Roy ran the business and fixed the policies of the Knox corporations, and that he possessed dominance and control over all of their phases of operation. The directors and stockholders in Knox of Pennsylvania left the business and policies of the Knox companies to Roy, without dissent. He was the policy-maker by the consent and acquiescence of the stockholder, Knox of Pennsylvania, and he was the man who decided and established the Knox policy against company ownership of over-the-road trucks. Nor does the evidence indicate that this decision was affected by any bad faith or fraudulent purpose on his part. It was a business-judgment decision which, although manifestly erroneous, was the fixed and undisputed policy of this chief executive of the Knox companies.

Moreover, knowledge of the truck leases by Roy R. Underwood was full and undisputed. He required Knox of Mississippi to furnish him, as president of Knox of Pennsylvania, monthly "clipper reports" of the truck operations. These were prepared by the traffic department of complainant and a copy was sent each month to Roy's office in Knox, Pennsylvania. These reports listed each truck, both company-owned and leased, and reflected the costs of operation and net revenues realized. These clipper reports came directly to the attention of Roy R. Underwood, and there was considerable correspondence between him and C. R. Underwood, much of which is in the record, about the leased trucks. The correspondence reflects that Roy was kept closely advised of all phases of the trucking operation. On April 8, 1950, he wrote: "I appreciate that we do not want to make capital expenditures for additional truck equipment at this time." On March 19, 1951, he wrote: "I observe that you are operating fourteen trucks under lease and nine trucks under ownership." Defendant Hester on several occasions tried to sell Roy trucks for Knox of Pennsylvania and for Knox of Mississippi, but Hester said he was never able to sell him on the idea of the company owning trucks.

The sole stockholder in Knox of Mississippi was Knox of Pennsylvania. Because of the status of Roy Underwood as the dominant and controlling executive of the Knox companies, and the comprehensive delegation of authority to him by the board of directors of Knox of Pennsylvania, his knowledge of the truck leases was the knowledge of the parent company, as the sole stockholder of complainant. There was a full disclosure of the facts to Roy, and the leasing of trucks during his lifetime met with his approval and was in accordance with his instructions. Under the peculiar circumstances of this case, the Court therefore holds that there was a full disclosure to the stockholders and directors of Knox of Pennsylvania through the man to whom they had delegated the executive powers, Roy R. Underwood. The board of directors gave him authority to determine the business policies of the holding company and its subsidiary. This authority was knowingly vested solely in him. It would be highly inequitable at this late date to permit complainant corporation to recover rentals paid on the truck leases during the period when Roy was the executive head of the Knox companies, when he had full knowledge of the leases and the revenues derived from them, and when the leases were kept in force and effect by complainant under his express instructions, which were based upon a good faith business-judgment decision by him as the president of both Knox of Pennsylvania and Knox of Mississippi. The chancellor was amply warranted in concluding that, for those reasons, complainant was not entitled to recover truck rentals paid defendants during the lifetime of Roy R. Underwood. Complainant is estopped from asserting a claim to truck rentals while Roy was the executive and dominating head of the Pennsylvania corporation.

Three of the Judges, being Judges Holmes, Gillespie and the writer, disagree with this conclusion, and are of the opinion that, under the principles discussed in Sec-

tion II, the defendants are liable for truck rentals (less depreciation and other properly deductible expenses) received by them before the death of Roy R. Underwood, as well as after that time. Judges Roberds and Arrington necessarily concur with the decision of the Court denying liability prior to Roy's death, since they are of the opinion that defendants have no liability to complainant for truck rentals prior to the date of the letter of Hon. P. H. Eager, attorney, to C. R. Underwood on May 15, 1953, in which counsel advised him that officers and directors occupy a fiduciary relationship, and that the lease agreements should be approved by the directors and stockholders of both the parent and subsidiary corporations, after a full disclosure.

## IV.

A majority of the Judges, being Judges McGehee, Hall, Kyle, Holmes, Ethridge and Gillespie, are of the opinion, and the Court holds, that defendants C. R. Underwood, E. F. Underwood, J. H. Underwood, Mrs. Florence P. Underwood, and E. F. Underwood as trustee, and J. H. Underwood as trustee, for their minor children are each liable severally for the net rentals received by the aforesaid parties from and after January 1, 1952. The extent to which joint and several liability exists will be discussed subsequently. Judge Lee will state his views on this and other points in a separate opinion.

Roy R. Underwood died on October 16, 1951, and on October 18, 1951, defendant C. R. Underwood became president of both Knox of Pennsylvania and Knox of Mississippi. He, E. F. and J. H. Underwood knew fully all the facts with reference to the truck leases, and were aware of the large personal profits being made therefrom by themselves and the other defendants. When C. R. assumed the duties of president of both corporations, and E. F. and J. H. Underwood were officers and

directors, they were free from the undisputed policy previously made by Roy R. Underwood, which forbade the use of company-owned trucks. C. R. Underwood, upon assuming the presidency of both corporations, and E. F. and J. H. Underwood clearly had the duty at that time to cancel these leases, and either to buy trucks for the corporation, or to negotiate at arm's length with lessors not connected with the corporation, or to obtain competitive bids from public contract carriers, or otherwise to make a reasonable effort to obtain the best transportation contracts that they could for the complainant corporation. It was their duty to cancel the leases and to eliminate the large personal profits which were being made on them by them as fiduciaries, by members of their family, and close personal friends and business associates.

■■ C. R. Underwood and the other officers and directors of the Mississippi corporation were entitled to have a reasonable time in which to survey the facts and to make the necessary changes. We think that from October 18, 1951 to January 1, 1952, would have been, under the circumstances, a sufficient and reasonable time to do this. Cf. 3 Fletcher, Corporations, Sec. 994, p. 491; Briggs v. Spaulding, 141 U.S. 132, 11 S. Ct. 924, 35 L. ED. 662 (1891); Prudential Trust Company v. McCarter, 271 Mass. 132, 171 N.E. 42, 52 (1929).

We base the foregoing conclusions upon the previously discussed principle that, where the corporation is represented in the transaction by the interested fiduciaries, who deal with themselves, the contract is voidable merely because of the relationship, without proof of actual fraud or of actual injury to the corporation.

■■ However, another legal principle equally applicable to this conclusion as to liability subsequent to January 1, 1952, is that C. R., E. F. and J. H. Underwood, defendants, were fiduciaries in their dealings with this corporation; that they knew that the contracts were

unfair to their cestui corporation, causing actual injury to it and draining it of very large profits which these fiduciaries should have directed to the corporation and not to themselves and their relatives, personal friends, and business associates; and that the overwhelming weight of the evidence demonstrates not only the unfairness of the contracts to the corporation, but that these officers acted in bad faith toward complainant, to which they owed a high standard of fidelity and responsibility.

■■ ■ The aforesaid conclusion, with reference to the liability for net rentals received by C. R., E. F. and J. H. Underwood, is likewise applicable to the profits received by Mrs. Florence P. Underwood, the wife of C. R. Underwood, to E. F. Underwood as trustee for Mary Ann Underwood and E. F. Underwood, Jr., and to J. H. Underwood, as trustee for Sandra Ann Underwood, a minor. These defendants were the wife, sons and trustees for the grandchildren, respectively, of C. R. Underwood, and the children of E. F. and J. H. Underwood, directors and officers. The rule is summarized in an annotation in 131 A.L.R. 990 (1941):

"The principle condemning transactions in which a trustee or other fiduciary acts in his own interest, and which might be adverse to the interest of the trust estate, or that of the beneficiaries or others whom he represents, has been found applicable in the vast majority of cases in which the question has arisen, to transactions by, or on behalf of, the spouse or other relative of such fiduciary. . . . . . It is settled that the rule against a trustee or other fiduciary engaging in transactions affecting the estate he represents, and particularly against such fiduciary profiting thereby at the expense of the beneficiaries or others represented by him, is applicable likewise as against the spouse or other relative of a fiduciary."

■■ ■ To the same effect are 54 Am. Jur., Trusts, Sec. 466; 3 Fletcher, Corporations, Sec. 946; 90 C.J.S., Trusts, Secs. 303, 434. In other words, where a fiduciary

is barred from making a profit at the expense of his trust or cestui, the prohibition likewise extends to the wife and other close relatives of the fiduciary. Matthews v. Matthews, 1 So. 741 (Miss. 1887) (children of administrator); Brandau v. Greer, 95 Miss. 100, 48 So. 519 (1909) (wife of guardian of minor ward). The practical reasons for the application of this principle here are manifest. Accordingly, Mrs. Florence P. Underwood, and E. F. and J. H. Underwood, trustees for the three grandchildren, are also liable severally for the profits received by them as individuals and as trustees from the truck rental agreements from and after January 1, 1952.

Judges Roberds and Arrington dissent from these conclusions, for the reasons and to the extent set forth in a separate opinion.

██ ██ There are three minor defendants to this suit. They are: Sandra Ann Underwood, a minor daughter of J. H. Underwood, and Mary Ann Underwood and E. F. Underwood, Jr., the minor daughter and son respectively of E. F. Underwood. The final decree of the chancery court correctly dismissed the bill of complaint as to them. There is no evidence that they knowingly participated with the three directors and officers in the violations of the latters' fiduciary duties. This, however, does not relieve their trustees from the liability to account for and repay to complainant the net rentals received by them as trustees for the trust accounts of these three minors as beneficiaries.

## V.

The remaining defendants are Miss C. Alberta Luter and W. E. Hester, Jr. Neither of these parties was a director or officer of complainant corporation during the period in question, from and after January 1, 1952. Nevertheless, they were close personal friends and business associates of the defendants who were officers and directors of complainant. The question is whether these

persons who had no official connection with complainant are liable for the profits received from the truck leases made by them and in effect from and after January 1, 1952. Before dealing with these two defendants individually, certain basic principles should be noted.

■■ ■ 3 Fletcher, Corporations, Sec. 947, states well the fundamental rule, citing numerous cases affirming it:

"If a third person joins with a corporate officer in dealing with the corporation, with knowledge that he is such officer, the contract may be set aside as to him as well as the corporate officer, and cannot be enforced by either party thereto, because they are in pari delicto. This is upon the theory that where a stranger participates with the officer of a corporation in the commission of an act of manifest bad faith or breach of duty to it, he, equally with the officer, commits a wrong and ought not to be allowed to derive profit from it. So a transaction between a corporation and one of its directors and a deed executed by an officer of a corporation running to himself as grantee raises at once the question of authority and good faith, and in the absence of absolute good faith may be avoided by the corporation or its stockholders, not only as to the grantee, but as to a third person with notice of the infirmity or knowledge of facts that would put him upon his inquiry."

54 Am. Jur., Trusts, Sec. 305, states:

"The law requires of those dealing with a trustee the exercise of good faith toward the beneficiaries of the trust. Where they participate, with actual or constructive knowledge of a trustee's breach of his duty, in such breach, they are liable to the trust estate or to the beneficiaries for loss caused to the trust estate by the trustee's breach of duty. The rule applies not only in respect of purchasers of trust property who take with actual or constructive notice that the sale is unauthorized and constitutes a breach of trust, but in various other situa-

tions, as where one makes a payment to a fiduciary, knowing that the fiduciary intends to misappropriate the money or otherwise be false to his trust, or otherwise knowingly aids or participates in a diversion of trust funds.''

Keeping in mind that this is essentially a suit in tort, a summary of the rule is given in 4 A.L.I., Restatement of the Law of Torts, Sec. 874, page 433:

''A person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is liable for the harm thereby caused ... The measure of his liability, however, may be different from that of the fiduciary since he is responsible only for harm caused or profits which he himself has made from the transaction, and he is not necessarily liable for the profits which the fiduciary has made nor for those which he should have made ....... The same principles are applicable where one has colluded with other types of fiduciaries.'' See also Restatement of Agency, Secs. 312, 313; Restatement of Trusts, Secs. 280-326; 3 Scott, Trusts, Secs. 326-326.6.

A leading case extending liability to third persons who knowingly assist corporate officers and directors in a diversion of corporate funds is American Agricultural Chemical Co. v. Robertson, 273 Mass. 66, 172 N.E. 871 (1930). The American Agricultural Chemical Company owned and controlled all of the capital stock, except qualifying shares, in three subsidiaries which were engaged in the business of purchasing materials from markets and butcher shops and rendering them into oils, tallows, and other products. Robertson, a defendant, was a manager of the rendering department of the chemical company, and exercised authority over the subsidiaries, in one of which he was a president and director. Murphy for a time was president and director of one of the subsidiaries, Brown Company, Inc. Robertson devised a fraudulent scheme of diverting money from the chemical

company and its subsidiary, Eastern Oil and Rendering Company, and in this plan, Murphy, who was not an officer or employee of Eastern Oil, knowingly assisted Robertson. The defendant Murphy knew that Robertson was an officer of and in a fiduciary relationship to Eastern Oil. Under this plan, Robertson and Murphy siphoned off a considerable amount of money from Eastern Oil. A large part of the money was used to pay off creditors, of whom Murphy was one. The judgment for the plaintiff corporation was affirmed on appeal. The Court, citing numerous cases to support its decision, held:

"Funds of a corporation can be lawfully used for corporate purposes only, and if misappropriated by the directors, they and whoever with notice participates with them are jointly and severally liable to the corporation for the loss and damage. . . . . Murphy, although not an officer or employee of the Eastern Oil, would be liable for knowingly assisting Robertson, who was in a fiduciary relationship to that corporation, in wrongfully diverting its funds either to himself or to the corporation which he controlled. . . . . The fact that Robertson was not also adjudged to be liable for this indebtedness is not a defense for Murphy."

Proctor v. Norris, 285 Mass. 161, 188 N.E. 625 (1934), was a suit by the trustee in bankruptcy of a corporation against an attorney-agent of the former president and dominant director of the corporation. In affirming a judgment against the defendant for knowingly participating in the diversion of corporate funds along with the fiduciary, the Court followed the Robertson case and numerous others. It held:

"The defendant thus came into possession of funds which apparently and in fact belonged to the corporation, and assisted MacClaskey in diverting them to an unlawful use. This was a wrong to the corporation. . . . . . In those cases, it is true, the person held liable received the money for his own benefit, and not merely for

the purpose of distribution to others. But personal benefit is not essential to liability...... An agent of a fiduciary who receives trust property and disposes of it in a transaction beyond the legal powers of the fiduciary is liable as a constructive trustee to the beneficiary.'' See also Durfee v. Durfee and Canning, 323 Mass. 187, 80 N.E. 2d 522, 527 (1948); Emmons v. Alvoid, 177 Mass. 466, 470, 59 N.E. 126.

In Jackson v. Smith, 254 U.S. 586, 41 S. Ct. 200, 65 L. Ed. 418 (1920), it was held that a person who knowingly joins with a receiver of a building association in violation of the latter's fiduciary duty is liable with the receiver for all profits realized from the purchase.

Irving Trust Company v. Deutsch, 73 F. 2d 121 (C. C. A. 2d, 1934), involves a significant application of this rule in a suit by the trustee in bankruptcy of a corporation against former directors and their associates for large profits made in the breach of the directors' fiduciary duties. The directors and the third persons who colluded with them in receiving such profits were held liable for the profits received. The Court said that ''one who knowingly joins a fiduciary in an enterprise where the personal interests of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise.''

United Zinc Company v. Harwood, 216 Mass. 474, 103 N.E. 1037 (1914), was a suit by the attempted assignee of a corporation against former directors and third persons who confederated or combined with them in violation of the directors' fiduciary duties, which resulted in each of the parties receiving profits at the expense of the corporation. The Court said that strangers who confederate or combined with the directors are accountable for the profits received in violation of the directors' duties, but the bill was dismissed because the right of action was not assignable to the plaintiffs. See also Old Mortgage and Finance Company v. Pasadena Land Co.,

241 Mich. 426, 216 N.W. 922 (1928); Attalla Iron Ore Co., v. Virginia Iron, Coal and Coke Company, 111 Tenn. 527, 537, 77 S.W. 774 (1903); First National Bank of Miami v. Vantage Mining Company, 105 Okla. 5, 231 Pac. 266 (1924); see also other cases cited in 3 Fletcher, Corporations, Sec. 947, quoted above.

Dunagan v. Bushey, 152 Texas 630, 263 S.W. 2d 148, 153 (1953), was a stockholders' derivative suit against corporate officers and a bank, to recover amounts which the bank had loaned to the officers, and they repaid to the bank with a corporate check. The Supreme Court of Texas rendered judgment against the three officers and the bank in favor of plaintiffs. The Court held that there was no question but the bank knew that the money was the property of the corporation. The Court said:

"The bank cannot be heard to say, after participating in the directors wrongful conversion of the corporation's funds to the bank's own substantial advantage, that it did not know of the wrong or that it was not consciously a participant in such wrong. Wichita Royalty Co. v. City Nat. Bank of Wichita Falls, 127 Texas 158, 89 S.W. 2d 394(1), 93 S.W. 2d 143; motion for rehearing overruled 127 Tex. 184, 93 S.W. 2d 143. It necessarily follows that the bank is also liable at the suit of the stockholders for the return to the corporate assets of the $18,025 so appropriated by it to the payment of the individual indebtedness of White, Bushey and Hill."

In Allied Freightways Inc. v. Cholfin, 325 Mass. 630, 91 N.E. 2d 765 (1950), a corporation sued certain directors for mismanagement and wrongful diversion of corporate funds for their personal benefit. The husband was a director and in sole charge of the business. The wife was also a director but not active in management. The Court held that she did not know of many of the wrongful acts of her husband, but she was responsible for the specific sums which she knew were improperly spent for her benefit, because to that extent she parti-

cipated in the wrong. Hauben v. Morris, 161 Misc. 174, 291 N.Y.S. 96 (1936), was the stockholders' derivative suit for the corporation against certain directors, to recover corporation money acquired by directors in violation of their fiduciary duty. The Court cited with approval and followed the decision of Justice Brandeis in Jackson v. Smith, supra, that third persons who knowingly join a fiduciary in an enterprise in violation of the fiduciary's duty likewise becomes liable for the profits received. Although there are numerous other authorities so holding, the foregoing citations are ample to demonstrate the established rule with reference to third persons.

The defendant, Miss C. Alberta Luter, was assistant secretary and assistant treasurer of the complainant corporation from April 5, 1934 until July 25, 1950, at which time she was elected secretary and assistant treasurer, in which capacity she remained until January 23, 1951. She was a director of complainant from July 26, 1941 until January 23, 1951. During this period she was also the personal assistant and close personal friend of the defendant, C. R. Underwood. She leased four truck units to the complainant corporation, two in 1949 and two in 1950. The contracts continued in effect until the Underwood interests were ousted from the corporation in the latter part of 1953. No leases were made by her to complainant after the death of Roy R. Underwood in October 1951.

However, after that date and through October 31, 1953, Miss Luter received in 22 months net profits of $82,171.03 from the truck rentals, after deducting estimated depreciation at a rate of 25 percent per annum and operating expenses. She was an officer of the corporation for over 17 years prior to her resignation on January 23, 1951. From September 12, 1949 through October 31, 1953, she received net profits in truck rentals of $191,101.52, after deduction of operating expenses and estimated deprecia-

tion at a rate of 25 percent per annum. Thus in a period of slightly more than four years she received from complainant in excess of $47,700 per year in truck rentals. This was in addition to her substantial salaries and bonuses received from complaint corporation up through the date she was discharged on January 23, 1951. It is clear from all of the evidence that Miss Luter received these enormous profits by joining with the three Underwood directors, and particularly C. R. Underwood, the president, in dealing with the corporation, with knowledge that he and the others were in a fiduciary capacity and were improperly diverting funds from the corporation under grossly unfair contracts.

It is undisputed that Miss Luter knew that C. R. Underwood occupied a fiduciary relationship to the corporation. Also, she was his close personal friend, confidant, and business associate, not only in complainant but also in Flowood Corporation. Their joint participation in dealing with the corporation is indicated by the situation outlined previously, whereby after a shortage of over $24,000 was discovered in Miss Luter's accounts with complainant, C. R. Underwood went to Memphis and borrowed $25,000, which was used to pay off this shortage. At the end of 1949, after the shortage had been discovered, C. R. Underwood was instrumental in having the corporation pay her a bonus for that year of $7,000. In January and February of 1950, C. R. Underwood permitted Miss Luter to lease two more trucks to the corporation, and from these two trucks alone in 1950 she received net rentals in excess of $27,000. After this, she repaid C. R. Underwood the money he had borrowed to amortize her shortage. After the discovery of the shortage, C. R. Underwood caused Miss Luter to be paid a salary for the remainder of the year 1949, and her salary of $8400 for the full year of 1950, and a salary of $1050 for the first month and a half of 1951. This was despite the fact that she did no work for Knox following the dis-

covery of the shortage, except to write up the minutes of about eleven directors' meetings.

Moreover, the 1954 audit of complainant's books by Ernst & Ernst, certified public accountants, shows eleven checks totaling $6,726.48, payable to a Jackson bank, which were charged to freight expenses, which were not stamped by the collection teller, and which were not included in the total of $24,775.91 charged to Miss Luter as of November 1, 1949.

On March 6, 1947, a check of complainant in the amount of $5,114.80, was applied to the payment of two personal notes executed by C. R. Underwood to a Jackson bank. The check stub was in the handwriting of Luter, as were the other entries on the company's books on which this check was charged to Palestine operations freight account. The amount of this check was not charged to C. R. Underwood, nor did Knox ever receive any money in repayment of it.

In July 1953, Miss Luter handled for George H. Underwood, a nephew of C. R. Underwood, and a resident of Pennsylvania, the purchase by him of two trucks from Motors, Inc., arranged for a Jackson bank to loan the money to George, and helped in arranging the leasing of trucks to Knox of Mississippi. George put up no cash. She promptly wrote a letter to C. R. Underwood advising him that the truck purchases for George had been handled by her to completion, and said, "Now, George has one of those long list of payments to keep up with. We are not alone in this deal."

After Miss Luter was removed as a director, she continued to have an office in another building on complainant's property, in addition to her work as secretary of Flowood Corporation, of which C. R. Underwood was president. She continued to advise C. R. Underwood in his direction of the affairs of Knox of Mississippi, even after he had moved to Pennsylvania. For example, John Smith, the traffic manager, had instructed an employee

of complainant not to wash any more of Miss Luter's cars. C. R. Underwood became considerably incensed, and wrote Smith on May 31, 1952, that "this had better not happen again. . . Alberta is operating a very substantial business, which I am deeply interested in, both financially and from a personal viewpoint. Whether I am in town or out of town, she speaks with the authority which I have vested in her and anyone interfering with my policy and procedures will not be wanted around this outfit."

Interrogated about this letter, C. R. Underwood testified that "salary-wise" Miss Luter had no connection with Knox of Mississippi. She was in the office which he had arranged for her. But, he said, "she was very helpful to me in directing the affairs of the Knox Glass Bottle Company."

Manifestly when Miss Luter complained about something at Knox, long after she had officially severed connection with the company, C. R. Underwood vigorously corrected the cause of the complaint. And as he said, she was "very helpful" to him "in directing the affairs" of Knox of Mississippi, after he became president of both companies.

██ ██ A majority of the Judges, being Judges McGehee, Hall, Kyle, Holmes, Gillespie and the writer, are of the opinion, and the Court holds, that Miss Luter actively participated and joined with C. R. Underwood, with actual knowledge of the breach of his fiduciary duties, in obtaining profits by truck rentals from complainant corporation, and that she is liable for the net profits received by her from the truck rentals on and after January 1, 1952. All of these and other circumstances render it manifest that C. R. Underwood and Luter were close personal friends and business associates, and that she knowingly participated with him and E. F. and J. H. Underwood in the breach of their fiduciary duties to the corporation, by the continuance in effect of the leases by

her to the corporation after Roy's death. She comes clearly within the universally accepted rule that one who participates with a fiduciary in a breach of his duties, with knowledge that he is violating his obligations, is liable for the profits received thereby from the corporation.

■■■ The defendant, W. E. Hester, Jr., was a partner with defendant E. F. Underwood in "Hutco", which partnership in 1949 leased three units to complainant corporation, including the soda-ash truck. Hester was also the general manager of Motors, Inc., which operates a distributorship of trucks, tractors and trailers in the City of Jackson, and which sold all of the motor vehicles to complainant and to the defendants. Principal stockholders in Motors, Inc., are the defendants E. F. Underwood, J. H. Underwood, and Mrs. Florence P. Underwood. Hester was never an officer or director in complainant and did not occupy any fiduciary relationship to it. For that reason, and because the evidence fails to show that he knowingly colluded with the Underwood officers and directors in the violation of their fiduciary duties, a majority of the Judges, being Judges McGehee, Roberds, Hall, Lee, Kyle and Arrington, are of the opinion, and the Court holds, that complainant has no right of recovery for truck rentals received by Hester. Of course, E. F. Underwood is liable for his share of the profits received by Hutco, the partnership in which he and Hester were copartners. Judges Holmes, Ethridge and Gillespie dissent from this conclusion with respect to Hester, and also are of the opinion that even if Hester is not liable, his partner, E. F. Underwood, should be held liable for all of the profits received by the Hutco partnership.

## VI.

■■■ The next question is whether the three defendants who were directors and officers of complainant corporation after the death of Roy R. Underwood, namely,

C. R. Underwood, E. F. Underwood, and J. H. Underwood, are liable not only for the profits which they received individually after Roy's death in the form of truck rentals, but also whether each of these three stated individuals are jointly and severally liable for the profits received (a) by each other, their cofiduciaries and codirectors, and (b) by the other defendants whom they knowingly permitted to receive such profits, and with whom such three directors, defendants, participated in the breach of trust. We think they are.

This is a suit in tort against alleged tort-feasors, former officers and directors of complainant corporation and their close personal friends and business associates. With this principle in mind, 3 Fletcher, Corporations, Sec. 1002, states:

"The liability of a tort-feasor is both joint and several. It follows that the liability of corporate officers for mismanagement is several as well as joint. The liability is joint and several where two or more directors participate in the wrongful acts."

This quoted principle seems to be universal and undisputed. Fletcher cites in support of it cases from twelve states, including National Casualty Co. v. Hallam, 163 Miss. 164, 138 So. 572 (1932). That was a suit in equity by Hallam as receiver for the Mississippi Life and Casualty Insurance Company. It was brought against Cadenhead, who was a fiscal agent of the corporation for the purpose of selling its stock, and against Oubre, who was its treasurer. The Court found that they had conspired together to defraud the insurance company of $9,000, which they had unlawfully diverted to themselves. The Court held that these two former officers "were jointly and severally liable for each act of wrongful conversion and fraud."

3 Fletcher, Corporations, Sec. 1314, states:—"Ordinarily, regardless of who brings the action, one or more of the directors or other officers may be sued, and it is

not necessary to join codirectors or other officers although they are equally guilty, since the liability is joint and several.''

The rule which condemns contracts made between a director and a corporation to which he owes a fiduciary duty is not limited to the recovery of profits received by the particular director alone. 3 Fletcher, Corporations, Sec. 884, p. 276. In a proper case recovery may be had from a director for profits made by ''a party in whom the officer is interested.''

19 C.J.S., Corporations, Sec. 764, discusses the duties of directors and officers and their liabilities. It says:

''They are liable jointly and severally for losses of the corporation caused by their bad faith or willful and intentional departures from duty, their fraudulent breaches of trust, their gross or willful negligence, or their ultra vires acts. . . . . A director is not liable for an act complained of unless it is shown that he participated therein or negligently omitted to perform his duty.'' See Ibid., Sec. 865; McGinnis v. Corporation Funding and Finance Co., 8 F. 2d 532 (D.C. Pa. 1925); Komenarsky v. Brode, 307 Pa. 156, 160 A. 713 (1932); Beard v. Achenbach Memorial Hospital Assn., 170 F. 2d 859 (1948); Hauben v. Morris, 161 Misc. 174, 291 N.Y.S. 96 (1936).

13 Am. Jur., Corporations, Sec. 994, deals with joint and several liability of directors, and states the principle that ''where two or more officers join or participate in the wrongful act, they are as a general rule jointly and severally liable.'' North Hudson Mutual Building and Loan Assn. v. Childs, 82 Wis. 460, 52 N.W. 600 (1892). The same text further states:

''It has been held that if strangers confederate or combine with directors in a transaction resulting in impairment of the corporate assets, injury to its property, or unlawful profit to themselves, all are jointly liable and may be sued jointly, and each is accountable for the funds

or property unlawfully diverted. United Zinc Cos. v. Harwood, 216 Mass. 474, 103 N.E. 1037, Ann. Cas. 1915B, 948.''

Many cases state that corporation directors are trustees for the stockholders. All the authorities hold that the relationship is a fiduciary one. 1 Bogert, Trusts, Sec. 16, p. 80, et seq.; 3 Fletcher, Corporations, Sec. 913, p. 331; 19 C.J.S., Corporations, pp. 105, 151. In other words, as 19 C.J.S., Corporations, Sec. 761, p. 105, says, ''A director's duties being trust duties or in the nature of the duties of a trustee toward his cestui que trust, his acts are subject to be tested by the rules governing the relation of a trustee to his cestui que trust.'' It is not entirely accurate to say that a director is a trustee, because he does not hold title to the property, but it is clear that the rule as to whether the liability of directors and officers is joint and several is the same as applies to trustees.

The general rule with reference to joint and several liability of co-trustees is summarized in 2 Scott, Trusts (1939), Sec. 258, p. 1460:

''Where two or more trustees are liable for a breach of trust committed by them jointly, or for a breach of trust committed by one of them for which the others are liable, they are jointly and severally liable to the beneficiaries for the breach of trust. The beneficiaries can join them as defendants and can enforce the liability against any one or more of them, being limited of course to a single satisfaction.''

The same text in Sec. 224.6 states: ''Where several trustees are liable for a breach of trust committed by them jointly, or for a breach of trust committed by one of them for which the others are liable under the principles here stated, they are jointly and severally liable to the beneficiaries. The beneficiaries can obtain a decree against all of them jointly, or they may obtain a decree against one or more of them severally. They can, of

course, obtain only a single satisfaction for the breach of trust.''

Scott, in Sec. 224, outlines the various circumstances under which joint and several liability are imposed upon co-trustees: ''Where there are two trustees and a breach of trust is committed by one of them, the other is liable if he is himself guilty of a violation of duty to the beneficiaries. This is the case (1) where he participates in the breach of trust; (2) where he improperly delegates the administration of the trust to his co-trustee; (3) where by his failure to exercise reasonable care he has enabled his co-trustee to commit the breach of trust; (4) where he approves or acquiesces in or conceals the breach of trust; or (5) where he neglects to take proper steps to compel his co-trustee to redress the breach of trust.'' To the same effect are 4 Bogert, Trusts and Trustees, Secs. 862 and 955, and 1 A.L.I., Restatement of Law of Trusts (1935), Sec. 224.

Marcus v. Otis, 168 F. 2d 649, 658-659 (C.C.A. 2d 1948), reaffirmed in 169 F. 2d 148, applies the rule as to joint and several liability of co-trustees to a stockholder's derivative suit for a corporation against several of its former directors for conversion of corporate funds. There Judge Learned Hand said: ''All fiduciaries who take part in a conversion are liable jointly and severally for the whole amount,'' citing Sec. 258 of Scott on Trusts. In a similar suit against recreant directors of a corporation, Sigwald v. City Bank, 82 S.C. 382, 64 S.E. 398 (1909), held that the co-directors were joint tort-feasors, liable both jointly and severally. In Komenarsky v. Brode, 307 Pa. 156, 160 A. 713 (1932), in a suit by a corporation against co-directors for fraud in the wrongful payment of salaries and dividends, the Court held that ''directors of a corporation are jointly as well as severally liable for mismanagement, willful neglect, or misconduct or corporate affairs.''

Denny v. Guyton, 331 Mo. 1115, 57 S.W. 2d 415, 433 (1932), was a suit by a beneficiary of a trust constituting a joint adventure by several men, against several of the defaulting and fraudulent joint adventurers. In affirming a judgment for the plaintiff, the Court said: ''But the weight of authority is that where co-trustees have concurred in a breach of trust they are jointly liable. It is stated thus in Pomeroy's Equity, vol. 3 (4th ed.), Sec. 1081, p. 2483: 'The rule is firmly settled that where a breach of trust has affected two or more or all of co-trustees with a common liability, they are liable jointly and severally; each is liable for the whole loss sustained or the whole amount due, and a decree obtained against them jointly may be enforced against any one of them.' '' It should be noted that Guyton, one of the defaulting trustees who had died and the suit revived against his wife, did not receive all the profits coming to him, but divided the profits among members of his family. None of those members of his family was a party to this suit. The divisions were made ''by and with the consent of the co-trustees.'' The Court held that the defendants could not complain of the application of joint and several liability rule to them. Another illustrative case applying the joint and several liability rule to co-directors in a suit by a corporation against them is American Agricultural Chemical Co. v. Robertson, 273 Mass. 66, 172 N.E. 871 (1930), which has been discussed more in detail previously on the question of the liability of third persons who are not fiduciaries, directors or officers, but who knowingly assist fiduciaries in the diversion of corporate funds.

In Hauben v. Morris, 161 Misc. 174, 291 N.Y.S. 96 (1936), a stockholders' derivative suit was brought against directors to recover money acquired by them in violation of their fiduciary duty. They were held liable for the profits. The Court said:

"The nature of the liability of the defendants in this case and the extent of the recovery against them is our next and final consideration. Here, the applicability of the general rule that directors are jointly and severally liable to account for profits earned by breach of their fiduciary duty cannot be gainsaid. Nor does the fact that part of the profits were earned by members of the syndicate who were not directors of the corporation change this result. Mr. Justice Brandeis, speaking for the Supreme Court of the United States in Jackson v. Smith, 254 U.S. 586, at pages 588, 589, 41 S. Ct. 200, 201, 65 L. Ed. 418, stated the rule as follows:

" 'When he agreed with Smith and Wilson to join in the purchase if Wilson should become the successful bidder, he placed himself in a position in which his personal interests were, or might be, antagonistic to those of his trust. Michoud v. Girod, 4 How. 503, 552 (11 L. Ed. 1076). It became to his personal interest that the purchase should be made by Wilson for the lowest possible price. The course taken was one which a fiduciary could not legally pursue. Magruder v. Drury, 235 U.S. 106, 119, 120 (35 S. Ct. 77, 59 L. Ed. 151). Since he did pursue it and profits resulted the law made him accountable to the trust estate for all the profits obtained by him and those who were associated with him in the matter, although the estate may not have been injured thereby.' . . . This joint and several liability dictates the conclusion that the entire profits of the syndicate on the debenture stock purchased from Markle may be recovered from the defendants."

Bingham v. Ditzler, 309 Ill. App. 581, 33 N.E. 2d 939 (1941), was a stockholders' derivative suit against certain officers and directors of the defendant corporation, seeking repayment to the corporation by the co-defendants of excessive bonuses and salaries improperly paid to such directors and officers. The Court affirmed a decree for the plaintiff. It reiterated the established rule

that the directors are trustees of the business for the collective body of stockholders, and are subject to the general rules in regard to trusts. Therefore, the trial court "was fully justified in entering the decree which called upon the directors in question jointly and severally to account for the moneys that were received, such accounting to be for the benefit of the defendant company. . . ."

In Allied Freightways, Inc. v. Cholfin, 325 Mass. 630, 91 N.E. 2d 765 (1950), a corporation sued two of its directors, husband and wife, to recover corporate money wrongfully diverted by them for their personal benefit. The husband was a director and in sole charge of the business. The wife was not active in the business and had no knowledge of most of the profits received by the husband. The Court limited her liability to the specific sums which she knew where expended for her benefit. However, the husband was "liable to the corporation for the entire loss thereby sustained by the corporation, and the fact that a part of the funds was used for the benefit of his wife is immaterial in determining the extent of his liability and the amount for which restitution should be made by him." Hence he was held jointly and severally liable for the total amount of the withdrawals, including both those received by himself and by his wife. See also Dunagan v. Bushey, supra.

■■ In summary, the overwhelming weight of authority is to the effect that corporate officers and directors who knowingly participate in the wrongful diversion of corporate funds are jointly and severally liable therefor. At all times after the death of Roy R. Underwood, C. R. Underwood was president and a member of the Board of Directors of both Knox of Mississippi and Knox of Pennsylvania. At all such times defendant E. F. Underwood was an officer and director of complainant corporation. Defendant J. H. Underwood, for most of the period in question after the death of Roy R. Underwood, was an officer of complainant, from March 1952,

and a director from May 1952. Under the foregoing well-established principles, a majority of the Judges, being Judges McGehee, Hall, Kyle, Holmes, Ethridge and Gillespie, are of the opinion, and the Court holds, that C. R. Underwood, E. F. Underwood, and J. H. Underwood (from the time he was an officer during the period in question) are jointly and severally liable for the profits received from the truck leases after Roy's death by each of their co-directors as well as by each individually.

A majority ·of the Judges, being Judges McGehee, Hall, Kyle, Holmes, Ethridge and Gillespie, are further of the opinion, and the Court holds, that C. R. Underwood, E. F. Underwood, and J. H. Underwood (from the time he became an officer during the period in question) are also jointly and severally liable for the profits received from truck leases after Roy's death by these defendants: Mrs. Florence P. Underwood; E. F. Underwood, trustee for Mary Ann Underwood and E. F. Underwood, Jr.; J. H. Underwood, trustee for Sandra Ann Underwood; and C. Alberta Luter.

Judges Roberds and Arrington dissent from these conclusions. And Judges Holmes, Gillespie and the writer would extend the joint and several liability also to Hester's profits.

A majority of the Judges, being Judges McGehee, Hall, Kyle, Holmes, Ethridge and Gillespie, are of the opinion, and the Court holds, that the profits recoverable from the defendants include truck rentals resulting both from the hauling of complainant's property and products, both direct and back-hauls, and from the carrying on some of the back-hauls of the property of third persons. Those latter shipments were made possible entirely through the improper leases to complainant, which arranged for the back-hauls, furnished all terminal facilities, and directed the operating and maintenance personnel. Direct hauls and back-hauls for third persons were closely interrelated, and profits in the form

of rentals resulting from both of them stemmed from the breach of duty by fiduciaries, officers and directors of complainant. These rentals were paid to defendants. Therefore, it would be highly unjust and unsound to permit defendants to retain back-haul profits in the form of rentals. For these reasons, the profits recoverable include all rentals on the trucks, comprehending both direct and back-hauls. Judges Roberds and Arrington dissent from this conclusion.

 When these profits in the form of net rentals are computed upon the limited remand of this case solely for that purpose, there should be deducted therefrom (a) actual depreciation for the period in question where the trucks have been sold, or, if that is not possible, a theoretical depreciation for the period in question, and (b) any other expenses in connection with the trucks which would be properly deductible in the computation of net rentals received by defendants. These factors should be determined in accordance with generally accepted and sound accounting practices.

 There is no merit in the contention of appellees that appellant ratified the truck leases by its actions with reference to them after the removal of the Underwoods as officers, on December 1, 1953, and is estopped now to appellees were made within a reasonable time after the repudiate them. Appellant's letters of January 6, 1954 to new administration came into power, clearly repudiated the lease agreements, denied their validity, and tendered immediate possession of the trucks to appellees. When appellant purchased some of the trucking equipment from the lessors on February 23, 1954, the bills of sale recited that the purchase was without prejudice to appellant's rights to bring this suit, and appellant reserved all rights to repudiate the leases and recover the money paid under them. The fact that appellant's clerical employees continued to send debit and credit memoranda to defendants pursuant to the previous routine in

that respect does not constitute a ratification. Moreover, even assuming a ratification, appellant would still be entitled to recover the profits. Where a contract with corporate officers is voidable, the corporation has several available remedies: To hold the officers on the contract according to its terms, to repudiate it and sue to set it aside, or to affirm the contract and hold the officer for profits received. 3 Fletcher, Corporations, Secs. 1295, 924.

On the cross-bills of defendants and cross-complainants, the appellees, the final decree of the chancery court rendered judgment in favor of Mrs. Florence P. Underwood against appellant for unpaid rentals on her equipment for the months of November and December 1953 and January and February 1954; and also rendered judgment in favor of appellees, E. F. Underwood, Trustee; J. H. Underwood, Trustee; J. H. Underwood, individually; E. F. Underwood, individually; and E. F. Underwood and W. E. Hester, Jr., doing business as Hutco, a partnership; and in favor of C. Alberta Luter, for similar unpaid rentals. In view of our decision that complainant can recover from these defendants, except Hester, profits received on and after January 1, 1952, the decree of the chancery court is necessarily reversed as it applies to the relief granted appellees on their cross-bills, and judgment is rendered here dismissing with prejudice all of the cross-bills of appellees, except that of W. E. Hester, Jr. Judgment is rendered here in favor of Hester on his cross-bill for his one-half interest in the unpaid rentals owed the Hutco partnership by appellant for the months of November and December 1953 and January and February 1954, being the sum of $6,322.19.

 The cross-appeals of cross-complainants, except Hester, contending that they as cross-appellants should be allowed interest on the judgments given them in the final decree from the due date of the obligation rather than the date of the decree, become moot, and

are dismissed. The cross-appeal of W. E. Hester, Jr. is sustained, to the extent that interest on the amount owed Hester by Knox of Mississippi should run from the due dates of the respective rentals, and judgment is rendered accordingly.

The final decree of the chancery court dismissed the bill as to the three minor defendants, individually, and no appeal was taken by complainant as to that action. That is not an issue on this appeal. Hence the decree is affirmed in part to that extent. Also, we affirm in part the decree insofar as it grants Hester a recovery for his one-half interest in the Hutco partnership profits, although the trial court's decree in this respect erroneously combines in the recovery the entire Hutco partnership profits. Moreover, we add to Hester's judgment interest from the due dates of his one-half share of the rentals. Also, the decree denied J. H. Underwood's bonus claim, and he took no cross-appeal as to that, so it is not an issue on this appeal. Other than in these respects, the decree of the chancery court is reversed.

In summary, the decree of the chancery court is reversed and judgment is rendered here adjudicating that the defendants, C. R. and E. F. Underwood, are jointly and severally liable to complainant for the truck profits received by them and are also jointly and severally liable for the truck profits received by all of the other defendants, except Hester, on and after January 1, 1952. Judgment is rendered here adjudicating that the defendant J. H. Underwood is liable to complainant for all truck profits received by him personally on and after March 1, 1952, and he is further jointly and severally liable to complainant for the profits made from the trucking operations by all of the other defendants, except Hester, during a period of time beginning when he became an officer of complainant in March 1952.

Judgment is also rendered here for complainant against E. F. Underwood, as trustee for his minor child-

ren, Mary Ann Underwood and E. F. Underwood, Jr., and against J. H. Underwood as trustee for his minor child, Sandra Ann Underwood, for the amount of truck profits received by each of these defendants as trustees beginning on January 1, 1952.

Judgment is rendered for complainant against defendant, C. Alberta Luter, adjudicating that she is liable for the truck profits which she personally received on and after January 1, 1952. Judgment is also rendered in favor of complainant against defendant, Florence P. Underwood, adjudicating that she is personally liable for the truck profits which she received on and after January 1, 1952. And lastly, judgment is rendered adjudicating that W. E. Hester, Jr., shall recover on his cross-bill from complainant his one-half share, being $6,322.19, of the unpaid truck rentals under the Hutco leases to complainant, with 6 percent interest from their due dates, and further adjudicating that the bill of complaint is dismissed with prejudice insofar as it applies to Hester.

The judgment of this Court will adjudicate the rights and liabilities of all parties, as determined in this opinion. The only thing remaining to be done with reference to this case is to determine the specific amounts of the judgment to be granted appellant against the appellees, except Hester. That is measured by the net profits from truck rentals received by appellees for a period beginning with January 1, 1952, and including all profits received from that date. Since judgment is rendered here adjudicating the rights and liabilities of the parties, and the only thing remaining to be done is to determine the specific monetary amounts owed appellant by appellees for the period specifically defined in this opinion, the case is remanded to the chancery court solely and exclusively for the limited purpose of determining the monetary amounts of truck profits owed appellant by appellees, except Hester, in accordance with the decisions

in this opinion, and then for the rendition of a decree by that court in favor of appellant against appellees, except Hester, for the amounts so determined.

On direct appeal, affirmed in part, as to W. E. Hester, Jr., but otherwise reversed and judgment rendered here for appellant; on cross-appeals, reversed in part as to Hester, but other cross-appeals are dismissed; and case remanded solely for limited purpose of an accounting to ascertain amounts owed appellant by appellees, except Hester.

LEE, J., concurring in part and dissenting in part.

The majority of the Court, in my opinion, has correctly decided that the appellant is not entitled to recover anything from any of the defendants on account of monies which they obtained from leases during the lifetime of Roy R. Underwood and prior to January 1, 1952. Knox of Pennsylvania owned Knox of Mississippi. Roy R. Underwood, a large stockholder, was president of both corporations. Knox of Mississippi paid a large annual management fee to Knox of Pennsylvania. Roy R. Underwood was, in fact, the czar of both corporations. The stockholders' knowledge, acquiescence and ratification of his dominant management was doubtless the reason why his estate was not even made a party to this litigation.

Besides, in order to set up the corporate organization of Knox of Mississippi, the parent corporation issued one share only of stock each to C. R. Underwood, C. Alberta Luter, and E. F. Underwood, as qualifying shares to make them eligible as directors. But these parties were each required to endorse their share in blank and return it to the home office of the parent company. They were in fact servile followers and lackeys, without any actual authority whatever. The learned chancellor, constituting a court of equity and conscience,

was able to look through this subterfuge and determine the real status of these so-called directors. It is a far cry, in the circumstances of this case, to charge these individuals with the same high duties and responsibilities, which, as pointed out in the announced principles from the cases cited in the majority opinion, devolve upon bona fide directors and managing officers.

Following Roy R. Underwood's death, C. R. Underwood was elected president of both corporations, and acceded to such offices. E. F. Underwood continued in the office of director as he had previously acted. His lackey-like status did not change. C. Alberta Luter had even ceased to be a director prior to Roy R. Underwood's death. She held no connection, either official or otherwise, whatever with the corporation. J. H. Underwood was made a director on May 5, 1952. Obviously his status was the same as his predecessor.

Thus Roy R. Underwood, after his death, was replaced by czar C. R. Underwood, who made no change in policy. J. H. Underwood obtained his lease on September 8, 1948, and, although C. R. Underwood did not cancel it, the majority opinion holds that he is liable for all of the profits which he made after January 1, 1952. The basis for this imposition is that he became a director and was a son of C. R. Underwood. But he was the same kind of director as were the directors before Roy R. Underwood's death. It seems to me that this decision as to him is wholly inconsistent with the Court's opinion as to no liability against directors for the profits from their leases prior to January 1, 1952. Bad faith should not be imputed to a son, who holds a profitable contract, merely because subsequently his father succeeds to the presidency and does not exercise the power to cancel the contract.

There is a great difference between the relationship of father and son and the closer relationship of husband

and wife. This is recognized in the tort field. For instance, even a minor, if emancipated, may sue his father in tort. Lancaster v. Lancaster, 213 Miss. 536, 57 So. 2d 302. Obviously a son of full age may do so. And a mother may sue her adult daughter. Shearon v. Shearon, 219 Miss. 27, 68 So. 2d 71. On the contrary, neither husband nor wife may sue each other in tort. Ensminger v. Ensminger, 222 Miss. 799, 77 So. 2d 308. Nor may an unemancipated minor sue his parents therefor. Durham v. Durham, 227 Miss. 76, 85 So. 2d 807. There was no proof that J. H. Underwood was apprised in any way that his lease constituted a fraud on the corporation.

C. Alberta Luter ceased to be one of the lackey directors on July 26, 1951. Thereafter, she had no connection with, and was not even an employee of, the corporation. In my opinion, there is no justification for concluding that she knowingly assisted the officers and directors of the corporation in a diversion of corporate funds, as was dealt with in American Agricultural Chemical Company v. Robertson, 273 Mass. 66, 172 N. E. 871, and other cases cited in the majority opinion. The construction is too strained to say that, under the circumstances here, she entered into a scheme to divert company money to other sources. She was simply carrying out a contract which was profitable to her. The mere fact that her leases were profitable to her is not sufficient, in my opinion, to require her to pay all of her profits into the coffers of the company; and this is true without reference to any friendly or personal relations, which she may have had with C. R. Underwood.

In my opinion, C. R. Underwood, when he became president, ought to have canceled his own leases, those of his wife, and those which he had previously held and which he changed to, or placed in, the names of E. F. Underwood and J. H. Underwood for the benefit of his grandchildren. Especially was this required of him inasmuch as he was the head of the management and knew

that the profits from these leases were large. I cannot excuse the continuance of his own leases and those in which he gave his beneficial interest to his grandchildren. This is likewise true as to the leases of his wife. The relationship of husband and wife is close. With such a relation, there is a oneness, although it may sometimes be a question of which one. I think he should be required to repay the amounts which make up these three items.

However, I see a vast difference between this category and the other leases. The policy of nonownership of the trucks was firmly established. The board of directors of the parent company must have known and assented to that policy. There is no sufficient assurance that the board of directors of the parent company, if the matter had been timely submitted to them, would have changed the policy which had been promulgated and adhered to for such a long period of time by Roy R. Underwood, in whom they had so much confidence.

I find myself in agreement with much of the reasoning so ably presented in the dissenting opinion of Judge Roberds.

ROBERDS, P. J., dissenting in part.

Liability, or non-liability, of defendants to this bill may logically rest upon the facts and circumstances existing during three separate periods of time—that is, from 1934 to October 16, 1951, during which time Roy Underwood was president of both the Mississippi and the Pennsylvania Corporations; from October 18, 1951, to March 15, 1953, the date of the Eager letter, during which time C. R. Underwood was president of both corporations, and from March 15, 1953, date of the Eager letter, to November 26, 1953, on which latter date C. R. Underwood ceased to be an official of both corporations.

The majority opinion has adjudicated that no liability rests upon any defendant during the first period of time.

I concur in that conclusion. But, the majority opinion has imposed large and heavy personal liability on certain defendants during the second period of time. I disagree with that conclusion. It should be kept clearly in mind that the basis of liability, and the only ground of such personal liability, was the failure of defendants to change the method of doing business—that is, cancel out the truck leases and use the capital of the Mississippi Corporation, in the purchase and operation of the trucks in the delivery of the output of the plant of the complainant corporation after the death of Roy Underwood. The chancellor held that whether delivery of the output of the plant should be by leased-trucks or owned-trucks involved a question of business judgment, and that no personal liability resulted from the exercise of that judgment in good faith. I concur in that conclusion as it applies to the second period of time. Whether C. R. Underwood and the other officials of complainant corporation were under duty to change the method of delivery of the output of the plant after the death of Roy Underwood depends upon the facts and circumstances existing prior to and at the time C. R. Underwood became president of the complainant corporation. What were those circumstances and facts? As I relate them they are either not in substantial conflict or have been adjudicated by the chancellor on conflicting testimony.

There was no fraud, overreaching or unfairness in the truck lease contracts. They were all open and above board. They were a part of the records of the complainant corporation. The chancellor found these were facts.

The contracts, and, therefore, the method of doing business under them, had not only been agreed to and approved over the years but had been demanded by the Pennsylvania Corporation, owner of all of the stock of the complainant corporation. Roy Underwood was president of the parent corporation from 1933, and of the complainant corporation from 1934, to the date of his

death. He was a man of strong personality. He was considered somewhat of a genius in the manufacture of glass. He held power of attorney of the stockholders of the complainant corporation to vote all of the stock and to ''represent'' the corporation. That power of attorney was renewed from time to time and existed at the time of his death. He had instructed and demanded that the complainant corporation operate through leased trucks. He was opposed to investing in trucks the capital of the Corporation. The chancellor found, and the testimony supports the finding, that Roy Underwood, during the time he was president of the corporation, was the czar of the Knox industrial kingdom. Even witnesses for the complainant said he wielded unlimited power over the operation of both corporations. Roy himself expressed great gratification that not a single decision of his, during the time he ran the corporations, was ever questioned, a remarkable fact indeed considering the vast operations of the Knox industrial empire. And as showing conclusively the esteem and regard in which Roy was held by the officers and stockholders of complainant corporation, these officials, after his death, established a trust of one hundred thousand dollars for the benefit of his widow.

The stockholders of the complainant corporation knew all about the truck leases and the method of doing business under such leases. Copies of the leases were in the files of complainant corporation. Such copies were sent to Roy Underwood under his power of attorney from the stockholders. He had copies of all of them. The record before us discloses some forty-five letters written by Roy asking for detailed information as to their terms, the duties and obligations imposed by them, and their efficiency and economy of operation. Full information was given, including a complete record of trips, mileage, rate of pay, and every essential fact involved in them. The leases started in 1946. The first one was to Horton Smith,

who, strange to say, signed the bill herein but as a witness was frank enough to say the leases were fair and for the best interest of complainant. The Horton Smith lease was used as a model for the remainder of the leases.

Roy Underwood was present at all of the stockholders' meetings of the complainant corporation. In addition to that, certain other of the officials of the parent corporation came to Jackson and inspected the Jackson plant. They saw the trucks in operation. They caused an article, accompanied by photographs of themselves and the plant, to be published in a national magazine, which hailed the Knox operations as being models of their kind.

And to show conclusively the Pennsylvania Corporation, owning all of the stock of the complainant corporation, had exclusive control and management of the Mississippi Corporation, it is shown that the Mississippi Corporation paid to the Pennsylvania Corporation two thousand dollars per month for services of the parent corporation in managing and directing the affairs of the complainant corporation.

The truck-lease arrangement was of great benefit to complainant. The chancellor so found and the testimony amply supports the finding. The trucks were able to deliver the manufactured product of complainant to the doors of its customers. They ran day and night. Also, they picked up property on the way back to the plant, for which proper charges of transportation were made for the benefit of the truck lessors, the corporation itself having no power to charge for hauling property of others. This arrangement was taken into consideration in fixing the transportation cost. The chancellor, in his opinion, pointed out one specific instance of the advantage of this truck leasing arrangement. An important ingredient in the manufacture of glass is soda ash. This substance requires special equipment in its transportation. It was being purchased by complainant at Baton Rouge, Louisi-

ana. The owner of a leased truck especially equipped his truck for transportation of soda ash to the plant of complainant, a thing which had never been done before. This truck operated for five years, and during this time saved the complainant $174,831.80. In addition to this, the use of this truck instigated a movement to reduce railroad and common-carrier freight rates from Baton Rouge to Jackson, Mississippi, which reduction was finally made.

But it is said the lessors realized large profits from these leases. Indeed, that is the main ground for liability. Looking only at the figures the profits were large, especially in recent years. However, when examined in the light of the great advantages to the corporation from their operation and when compared with other transportation rates, it will be readily seen why the complainant adopted the leasing arrangement.

I have noted above the great advantages, as found by the chancellor, of the truck-leasing method over other means of transportation. I will not repeat these. But, aside from such advantages in the actual operations, the truck rates were based upon common carrier freight rates. Indeed, the provisions of the leases brought them under the Interstate Commerce Commission regulations. But there was this difference: The truck rates were based upon full carload lots. Rates for part carload lots are higher than full carload lots. All truck hauls, even consisting of partial loads, took the same rate as full loads. Thus the complainant got the benefit of full load rates on part load hauls, which was indeed an important item. In addition to this, lessors were credited with transportation charges on return hauls, which inured to the benefit of the corporation, which then had no legal right to transport for hire goods of another for its own benefit. Owners had their money in the purchase price of trucks, some especially equipped at large cost, and the depreciation on the trucks was very great. However, to show

conclusively the rates charged on the trucks were not excessive, the proof shows without dispute that in 1933-34, in the depth of the depression, the cost of transportation was 12.6% of the total sales; in 1953, transportation compared to sales costs was 12.69%, and during the past twenty years transportation cost to appellant has averaged 12.69% of the total cost of production, notwithstanding that during that period the cost of transportation has about doubled.

And as bearing upon the cost of transportation, and the effect upon the financial status of complainant corporation, the record discloses a modest financial beginning and an almost unbelievable financial growth. It started with $28,725 cash and secondhand glass machinery of the estimated value of $70,000.00. In other words, its assets amounted to less than one hundred thousand dollars. Its growth was so phenominal that for the first nine months of 1953, under the management of C. R. Underwood and the truck-leasing system, its net sales aggregated $11,580,717.70. The Mississippi Corporation made money constantly. The Pennsylvania Corporation lost money constantly. As a matter of fact the Pennsylvania Corporation, owner of all of the stock of the Mississippi Corporation, simply used the Mississippi Corporation to pump money into the Pennsylvania Corporation, as is shown, for instance, by the practice of having Mississippi remit to Pennsylvania $24,000.00 per year to pay Pennsylvania for so-called supervision of the Mississippi plant. As further proving the feeder method imposed upon complainant corporation I will give a list of the assessments made by the Pennsylvania Corporation against the Mississippi Corporation and paid by Mississippi Corporation in one year:

| | |
|---|---|
| Air Transportation _____$ | 8,486.07 |
| Engineering _____ | 27,487.44 |
| Glass container dues _____ | 15,923.17 |
| Knox management _____ | 24,000.00 |

| | |
|---|---|
| Laboratory Expense | 9,142.56 |
| Legal Expense | 8,100.00 |
| Glass purchase by parent company | 28,879.73 |

Again, the Mississippi Corporation paid the parent corporation the following dividends in four years:

| | |
|---|---|
| For 1948 | $ 17,734.50 |
| For 1949 | 54,920.00 |
| For 1950 | 131,829.25 |
| For 1951 | 198,734.50 |
| Aggregating | $402,218.25 |

This is enough to show that the Mississippi Corporation, under its truck-leasing system, was the corporation making the money, and that, contrary to nature, the parent corporation was sucking the life-blood out of its child.

Shortly after his election as president of the two corporations C. R. Underwood had an audit made of the affairs of the Pennsylvania Corporation. This was the first audit ever made of the affairs of that corporation. It disclosed the corporation to be insolvent. It showed liabilities of over two million dollars in excess of assets. The audit revealed overdrafts aggregating $1,555,070.80 and the corporation was endeavoring to meet this situation by an intricate slight-of-hand arrangement of kiting checks through five banks. It was engaged in a juggling contest trying to switch from one bank to the other what little available cash it had in order to meet outstanding checks. In that situation C. R. Underwood undertook to borrow money and refinance the corporation. He informed the prospective lender that Knox of Pennsylvania needed to borrow one million dollars. The prospective lender, after examining the audit and informing himself as to the financial condition of the corporation, told Underwood one million dollars would do him no good; that the corporation needed three million dollars. On June 24, 1952, as a result of these negotiations, a

loan of three million dollars was made by The Commercial Credit Company, Inc., of Maryland. It took a deed of trust on all of the property, real and personal, of both the Pennsylvania and Mississippi Corporations and their affiliates, to secure that loan. The terms of the trust deed vested in the mortgagee large powers as to how the corporate business should be conducted. As proving the dire financial condition of the Pennsylvania Corporation the mortgagor had to pay seven percent interest on this debt, and, as to some "factors", such as meeting drafts, debtors were obligated to pay nine percent interest. In addition to this, there was a provision in the trust deed which prohibited the mortgagor, under the existing facts, from investing any of the capital of the mortgagor in trucks. It is true that after C. R. Underwood was put out and the new management went in and the new management wanted to adopt the truck-ownership operations that, on request of the mortgagors and under the changed conditions, the mortgagee, to a limited extent, waived the mortgage provision which prohibited investment of corporate capital in trucks. However, that did not alter the fact that the terms of the trust deed, under the existing facts, absolutely forbade the Underwood management investing the capital of the corporation in trucks.

It is pertinent to add here that at one time under the Roy Underwood regime C. R. Underwood was inclined to favor ownership operation of the trucks. Roy Underwood, representing all the stockholders, forbade such investment and operation. But, after C. R. Underwood learned the true financial condition of the Pennsylvania Corporation, he changed his views and concluded it would be bad judgment to invest the corporate assets in trucks and operate them as owners. The total cost of all the trucks necessary to transport the goods of complainant is not shown, but, from what is disclosed by the record, such total cost would have been in excess of three

hundred thousand dollars, to say nothing of the cost of operating and keeping them in repair.

These were the conditions facing C. R. Underwood and his management. Did these conditions demand a cancellation of the truck leases and the purchase and operation of the trucks by the Corporation? Should the law impose disastrous personal money liability for failure to do that? I do not think so. Clearly, as held by the chancellor, the choice of methods of operation of the trucks was a matter of business judgment.

"The fairness of the transaction must be measured not by hindsight but in the light of the circumstances which presented themselves at the time of the transaction. A wisdom developed after an event, and having it and its consequences as a source, is a standard no man should be judged by * * *." Costello v. Costello, 209 N. Y. 252, 103 N. E. 148.

"Corporations must be allowed to function under majority control, as do most institutions in this country, so long as the majority does no actual wrong to the minority or others. Courts are not to be called on to operate or control them except in cases where such interference is essential to justice; and in interfering with what majority has done in such a case as this, real caution must be taken not to work a wrong in striving towards the right * * *." Landstreet, et al v. Meyer, et al, 201 Miss. 826, 29 So. 2d 653. The foregoing rule was quoted and approved in Hudson v. Belzoni Equipment Co., 211 Miss. 178, 51 So. 2d 223.

The stockholders of complainant corporation knew all about the terms of the truck leases and those who were parties to them and their relations to the corporation and to each other. They affirmed and ratified them. The chancellor found "That the stockholders of complainant corporation had knowledge of the truck leases throughout the period of time complained of; that complainant continued to operate the trucks under the leases in ques-

tion after defendants, C. R. Underwood, E. F. Underwood and J. H. Underwood were discharged as officers and directors of said complainant corporation and that by such use and by failing to make complaint in due course it has in effect affirmed, acquiesced in and ratified said leases."

It is a great injustice, in my humble opinion, to impose crushing personal liability on C. R. Underwood and those operating the complainant corporation with him because they did not cancel out these truck leases and invest several hundred thousand dollars of the capital of the corporation in the purchase and operation of trucks under the foregoing conditions. In the first place, as found by the chancellor, it involved only a question of business judgment, which this Court will not attempt to regulate, and in the second place, imposition of personal liability presupposes the system would have been changed had the question of change or no-change been brought before the stockholders of complainant corporation. There is no certainty whatever the change would have been made had the question been presented to the stockholders.

Again, in considering the question of fairness, right, and justice, it should be remembered that the new management, after C. R. Underwood severed his connection with the corporation, renewed and continued at least one of the leases in question.

Once again, looking to the right and justice of the situation, it should be kept in mind that only a part of the cost of transportation was incurred by operating leased trucks. This was the percentage: 33% of the corporate output was shipped in leased trucks; 41% was paid to customers who came for their goods; 17% was shipped in trucks owned by the corporation; 6% was shipped by rail and 3% by motor freight.

The complainant corporation did not lose a dime by the truck-leasing operations. It is not shown that it could have had its goods transported and delivered one

cent cheaper by any other method. Indeed, as above stated, the freight outlay under this method was cheaper than any other available method. Instead of showing a loss it has shown a profit under this system. The burden was upon it, as complainant, to show loss or damage. It has not done so. On the other hand enforcement of these personal decrees will result in this Corporation having transported and delivered a large part of its output for many years without a penny's cost to itself.

Now, as to liability after March 15, 1953, the date of the Pat Eager letter. In this letter Mr. Eager, a very able lawyer, called attention to the quasifiduciary relationship existing between corporations and their officers and stockholders. He quoted these rules at length as announced in recognized authorities. He then suggested that he thought these leased-truck contracts should be submitted to the directors and stockholders of the two corporations. This, to me, presents a different situation from that existing before this letter was received by Mr. C. R. Underwood. To that time he and his co-managers of the complainant corporation had a right to rely upon the contracts, which, as shown, had been authorized, confirmed and ratified. After receipt of the Eager letter, however, C. R. Underwood was put upon notice that new lease-truck contracts should be presented to the officers and stockholders of the two corporations. After receipt of this letter two lease contracts were executed by C. R. Underwood as lessor to the complainant corporation as lessee. At that time C. R. Underwood well knew the contents of the Eager letter. He did not submit his contracts to the directors and stockholders of either corporation. I think that was a breach of duty under these circumstances, and he might well be held liable for the rentals under these two contracts.

ARRINGTON, J., joins in this dissent.

## ON SUGGESTION OF ERROR

Per Curiam:

 ██ Of the numerous questions argued in the several suggestions of error the most forceful one is based on the premise that the Court held in its original decision that the lease contracts were valid until Roy Underwood died. This premise is not correctly assumed. The majority of the Court did not consider, and did not hold, the leases valid prior to the death of Roy Underwood. It was held that under the peculiar circumstances of the case the appellant was estopped to assert their invalidity.

In our opinion none of the questions presented justify any change in our decision.

Suggestions of error overruled.

*McGehee, C. J.,* and *Hall, Kyle, Holmes, Ethridge,* and *Gillespie, JJ.,* concur. *Roberds, Lee* and *Arrington, JJ.,* dissent.