IN THE SUPREME COURT OF MISSISSIPPI
NO. 95-CA-00067-SCT

*CHARLES L. FORTENBERRY, INDIVIDUALLY, AND AS SHAREHOLDER DERIVATIVELY FOR AND ON BEHALF OF E.M.& N., INC., A MISSISSIPPI CORPORATION*

*v.*

*THE ESTATE OF RANDOLPH L. BARNES, DECEASED, TOM M. LAMPKIN, BARNES TRUCK LINES, A MISSISSIPPI CORPORATION AND E.M. & N., INC., A MISSISSIPPI CORPORATION*

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-A**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/20/94 |
| TRIAL JUDGE: | HON. WILLIAM ROBERT TAYLOR JR. |
| COURT FROM WHICH APPEALED: | MARION COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | H. A. MOORE III |
| | STEPHEN LAMAR GOWAN |
| ATTORNEYS FOR APPELLEES: | KEN R. ADCOCK |
| | K. HAYES CALLICUT |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 6/19/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 7/10/97 |

**BEFORE SULLIVAN, P.J., PITTMAN AND BANKS, JJ.**

**PITTMAN, JUSTICE, FOR THE COURT:**

This is an appeal from the Chancery Court of Marion County, Mississippi. Charles Fortenberry (hereinafter "Fortenberry") filed a complaint against Randolph Barnes (hereinafter "Barnes"), Tom Lampkin (hereinafter "Lampkin"), and Barnes Truck Lines, (hereinafter "BTL"). The Defendants answered and challenged the standing of Fortenberry to bring the action on the grounds that Fortenberry sought to enforce a corporate right. In response, Fortenberry filed a separate derivative

action on behalf of E.M.& N., Inc. (hereinafter "EM&N"), against BTL, Barnes, Lampkin, and EM&N. The two cases were consolidated for trial. Prior to trial, Barnes died and his estate was substituted as a party defendant.

The substance of the case centered around a dispute among Fortenberry, Barnes, and Lampkin, who were equal shareholders in EM&N. The dispute concerned the non-payment of a $60,000 debt owed to EM&N by BTL. The case was tried before Judge William Robert Taylor, who entered findings of fact, conclusions of law and judgment, denying Fortenberry any relief. It is from this denial of relief that Fortenberry appeals and raises the following issues:

> **I. WAS FORTENBERRY ENTITLED TO BRING THE DERIVATIVE ACTION AGAINST BARNES TRUCK LINES ON BEHALF OF EM&N?**
>
> **II. DID BARNES AND LAMPKIN BREACH THEIR FIDUCIARY DUTY OF LOYALTY TO EM&N BY FAILING TO PURSUE COLLECTION OF A VALID DEBT?**
>
> **III. ARE BARNES AND LAMPKIN PERSONALLY LIABLE TO FORTENBERRY FOR BREACHING THEIR FIDUCIARY DUTY OF "STRICT GOOD FAITH" ARISING FROM THEIR RELATIONSHIP AS SHAREHOLDERS IN A CLOSELY HELD CORPORATION?**
>
> **IV. DID BARNES AND LAMPKIN ACQUIRE AN ADVANTAGE BY THEIR ACTIONS WHICH FORTENBERRY DID NOT GET?**

## STATEMENT OF THE FACTS

Barnes Truck Lines (hereinafter "BTL") was a common carrier under the ICC which was started by Randolph Barnes' father in the 1930's in Columbia, MS. It established itself as a "less than truckload carrier" hauling perishable goods in routes from Columbia to and from New Orleans and Bogalusa, LA and Jackson, MS. Following his father's retirement, Barnes became president of the company.

Fortenberry went to work for BTL around 1950. The company paid for Fortenberry to take accounting and personnel management classes at USM. Over the course of his employment with BTL, Fortenberry served as settlement clerk, rate clerk, billing clerk, claim agent, bookkeeper, and eventually became the general manager and vice president of the company in 1979. Fortenberry's wife and two daughters were also, at one time or another, employed by BTL.

Lampkin started work with BTL in 1962 as a truck driver, and eventually was promoted to terminal manager. He was responsible for the day-to-day oversight of the running of the trucks.

In December of 1978, Barnes, Lampkin, and Fortenberry formed a corporation called EM&N. Barnes, Lampkin, and Fortenberry were the only shareholders of the company, each owning a third. They also constituted the Board of Directors. The purpose of the corporation was to buy a five-acre tract of land in Rankin County. The shareholders planned to build a truck terminal there. The purchase price was $60,000, which was financed through Citizens Bank in Columbia, and eventually paid in full.

In August 1983, Barnes arranged for BTL to repurchase its shares of stock from his mother and his sister. The corporation executed a note to them in return for the stock which paid them approximately $5000 per month. At the same time, Barnes offered Fortenberry and Lampkin the opportunity to buy the stock, making each a one-third stockholder in BTL. Barnes owned the remaining third. In exchange for the stock ownership, Fortenberry and Lampkin each executed a $150,000 note to Barnes. Fortenberry and Lampkin also received raises in their salaries to enable them to make their payments on the notes.

Beginning in the 1980's, the trucking industry entered a period of significant change because the industry was deregulated. The new competition began to significantly affect BTL's business around 1984. In late 1983 and early 1984, Barnes's health was failing, and he relinquished the day-to-day management of BTL to Fortenberry. In 1984, the company experienced a decline in its performance, and additional operating capital was needed. Barnes, Fortenberry and Lampkin determined that EM&N could be used as the source for this additional capital. EM&N borrowed $60,000 from the Citizens Bank in Columbia, pledging the land in Rankin County as collateral, and then loaned the $60,000 to BTL. Fortenberry signed the check from EM&N to BTL as EM&N's president. The money was used by BTL to pay payroll and other operating expenses. No note was ever signed by BTL evidencing this debt, however, all parties agree that it was and is a debt owing from BTL to EM&N. The debt was entered on the books of BTL as an account payable, and on EM&N's books as a receivable. BTL began making payments which EM&N then payed to the bank.

In 1985, BTL's business continued to decline and it was faced with numerous bills, including a substantially increased liability insurance payment. BTL was faced with the decision of whether or not to continue its business. The only option to shutting down was the injection of additional capital. Fortenberry and Lampkin were unable to provide additional working capital. Barnes, who was not engaged in active management at that time, offered to repurchase all of the shares of stock from Fortenberry and Barnes in exchange for a $100,000 credit against each of their $150,000 notes. Since some payments had been made by Fortenberry and Lampkin on the original note, the amount due from each to Barnes after the credit was $31, 089.43. Each signed new notes in this amount and delivered them to Barnes. As the sole shareholder, Barnes determined to invest significant additional working capital.

There was conflicting testimony as to whether the Barnes "buy-out" of Fortenberry and Lampkin included any terms other than credit and subsequent notes. Fortenberry testified that the promise that BTL would pay its debt to EM&N was a part of the "buy-out". Lampkin said it was not discussed. Neither Ron Sanderson, a CPA called by Barnes, or Robert Jackson, an attorney called by Barnes, remembered any such discussion.

After Barnes took over the company in August 1985, the company continued to lose large amounts of money. BTL stopped paying the notes owed to Barnes's sister and mother (which had been executed when the company repurchased their stock) in the amount of roughly $500,000. In April 1986, BTL stopped paying its indebtedness to EM&N. The outstanding balance at that time was $53, 380.22. During this time, Barnes made cash contributions to BTL in the amount of $611,631.43 to pay past due operating debts of the company.

After the buy-out of Fortenberry and Lampkin, Fortenberry's services with BTL were terminated.

Lampkin was kept on, however, he no longer held any stock in the company and was not an officer or director. During the remainder of 1985 and 1986, BTL's business continued to decline. It ceased operations in March 1987. All three men continued as officers, directors, and shareholders of EM&N.

In late 1986, it was Barnes's desire that EM&N sell its Rankin County land. A meeting was called for October 30, to discuss the sale. Fortenberry has alleged that a secret meeting took place on October 29, 1986, in Robert Jackson's (attorney for Barnes, BTL, and EM&N) office between Barnes and Lampkin. There was testimony that Barnes and Lampkin drove to Hattiesburg to Jackson's office on October 29, but both testified that they got their dates mixed up, that nothing was discussed concerning EM&N or its land, that no conspiracy was hatched, no decisions were made, and that they returned home. Later, Fortenberry received a bill for services rendered from Jackson which included an entry for an October 29, 1986, board of directors meeting.

The meeting for October 30 was postponed until November 3, 1986. On that date, the meeting took place. Those present at the meeting were Barnes, Fortenberry, Lampkin (directors of EM&N), Mrs. Barnes and Robert Jackson. Fortenberry asked Jackson at the start of the meeting whom he represented and he said he was representing Mr. and Mrs. Barnes. Jackson acted as the temporary secretary for the meeting and took the minutes.

Certain actions were taken at the meeting which are reflected in the minutes. Specifically, it was decided, on a 3/2 vote (Barnes and Lampkin for and Fortenberry against) that the land owned by EM&N be sold. Fortenberry also testified that he moved that EM&N sue BTL for the balance due on its $60,000 debt and that neither Barnes nor Lampkin would second that motion. Fortenberry further testified that the failure or refusal of Barnes and Lampkin to second the motion was the result of a conspiracy begun at the secret meeting on October 29, 1986, and that such conspiracy was wrongful, and adversely affected his rights as a shareholder in EM&N. The corporate minutes reflect no formal motion was made by Fortenberry. However, Lampkin testified that near the end of the meeting, as it was breaking up, perhaps after Jackson was out of the room, Fortenberry suggested that a suit should be filed against BTL by EM&N. Lampkin further testified that he stated he did not want to sue anybody, and that he recalled no response on the part of Barnes. Lampkin also testified that he did not feel compelled or intimidated by virtue of his employment by BTL to take a position against having EM&N sue BTL, nor did he feel any pressure to support Barnes.

Although Fortenberry contended at trial that his agreement to allow Barnes to repurchase his stock and his agreement to execute a note in the amount of $31,089.43 in favor of Barnes was conditioned upon BTL paying the EM&N note, Fortenberry did not execute and deliver the note until after the November 3, 1986, meeting when he knew that BTL could not pay the note. Fortenberry has not defaulted on this debt.

The Court found that:

> [i]t would have been to Lampkin's and Barnes' advantage for the debt of BTL to EM&N to have been paid, because the three shareholders in EM&N were forced to use their personal funds to keep the EM&N indebtedness to Citizens Bank current, even though BTL had stopped paying EM&N on its indebtedness. The Court specifically finds that there was no conspiracy between Barnes and Lampkin to act in any improper manner, whether intrinsically unfair or

otherwise, toward Fortenberry or EM&N, and that Lampkin's opinion that a suit was not necessary or desirable did not constitute an unfair treatment of Fortenberry or EM&N. There is no credible testimony in the record to indicate that Lampkin's or Barnes' decisions were made from any considerations other than practical business considerations, in good faith, and the Court accordingly, so finds... There is no credible proof in the record that Lampkin and Barnes willfully and negligently depleted the assets of BTL. The proof is to the contrary. Lampkin, after BTL closed down in March, 1987, formed a partnership with persons totally unrelated to Barnes, members of his family, or BTL, and purchased a certificate of authority and certain equipment from BTL for fair and reasonable prices. The Court so specifically finds... Eventually, EM&N sold its land to a partnership formed by Lampkin and others, which was totally unrelated to Barnes and any of his family interest, or to BTL, a sale which the evidence undisputedly reflects was acceptable to Fortenberry. The Court specifically finds that Lampkin in no way benefitted from the business of BTL, or depleted its assets for the purpose of avoiding the payment of BTL to EM&N. Indeed, this Court finds that it was in Lampkin's and Barnes' interest that BTL pay its debt to EM&N, and that they were damaged by BTL's failure to do so as much as was Fortenberry... This Court finds that Lampkin and Barnes acted in good faith at all relevant times with all parties to the litigation.

Upon entering his findings of fact and conclusions of law, the chancellor denied Fortenberry any relief requested in his complaints.

## ANALYSIS

## STANDARD OF REVIEW

This Court will not disturb the findings of the Chancellor unless they are manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. ***Bell v. Parker,*** 563 So.2d 594, 597 (Miss. 1990). If a Chancellor's findings are supported by substantial, credible evidence, this Court will not reverse. ***Branton v. Branton,*** 559 So.2d 1038, 1042 (Miss. 1990).

### I. WAS FORTENBERRY ENTITLED TO BRING A DERIVATIVE ACTION AGAINST BARNES TRUCK LINE ON BEHALF OF E.M.&N., INC.?

Fortenberry puts at issue whether he was entitled to bring a derivative action against BTL on behalf of EM&N. It is difficult to understand why he puts this at issue when he did bring a derivative action on behalf of EM&N against BTL. It seems that Fortenberry actually assigns as error that the chancellor erred when he failed to void the action of Barnes and Lampkin in deciding not to sue BTL. Fortenberry bases his contention, that the decision not to sue should have been voided, on the charge that Barnes and Lampkin had conflicts of interest which disqualified them from participating in the decision.

The essence of Fortenberry's argument seems to be that Barnes and Lampkin were not disinterested directors in making the decision not to sue BTL. He argues that the chancellor effectively held that the decision not to sue was justified because it was based on "practical business consideration and good faith." Fortenberry contends that the business judgment rule is not available as a defense to an interested director, and that the chancellor misapplied the law.

Fortenberry cites this Court's decision in ***Knox Glass Co. v. Underwood,*** where it said, "Where . . . interested fiduciaries have acted for and represented both the corporation and themselves . . . it is well established that, in the absence of ratification or estoppel, and full disclosure, the transaction is voidable at the option of the corporation, without proof of actual fraud or of actual injury to the corporation." ***Knox Glass Co. v. Underwood,*** 89 So. 2d 799, 815 (Miss. 1956).

Fortenberry argues that Barnes was not disinterested because he was the sole stockholder in BTL, as well as its president. He was also an officer, director and shareholder of EM&N. He found himself in a situation where one company he owned was indebted to another company he partially owned. He also argues that Lampkin was not disinterested because he was employed by BTL, and dependent on it to pay his salary.

It does appear that Barnes and Lampkin were interested in BTL, and under ***Knox***, their decision would be voidable <u>at the option of the corporation.</u> *Id.* at 815. The chancellor did not err in refusing to void their decision not to sue. The decision was <u>voidable</u>. The Chancellor did not choose to void the decision because he found that Barnes and Lampkin had not breached their fiduciary duties, which will be discussed in the analysis of Fortenberry's remaining assignments of error.

### II. DID BARNES AND LAMPKIN BREACH THEIR FIDUCIARY DUTY OF LOYALTY TO EM&N BY FAILING TO PURSUE COLLECTION OF A VALID DEBT?

Fortenberry's next argument is that Barnes and Lampkin breached their fiduciary duties of loyalty to EM&N by failing to pursue collection of a valid debt. All parties agree that the debt was and is valid. Fortenberry contends that the Chancellor erred as a matter of law in not holding Barnes and Lampkin personally liable for the BTL debt to EM&N, and in failing to award punitive damages against them.

It is true that Barnes owned BTL and was its president at the time of the decision. It is also true that BTL was in a financial crisis at the time that Barnes refused to second a motion to sue BTL. He may have had a conflict of interest. Lampkin may have also had a conflict in that he was still employed with BTL at the time and was dependent upon it to pay his salary.

Fortenberry asserts, citing ***Ellzey v. Fyr-Pruf, Inc.*** and ***Knox Glass Co. v. Underwood***, that:

> once a conflict of interest has been shown to exist between the pursuits of a corporation and its fiduciary the burden rests upon the fiduciary to establish ratification upon full and continuing disclosure of material facts, inherent fairness, or other circumstances tending to show discharge by the fiduciary of his duty to the corporation.

***Ellzey v. Fyr-Pruf,*** 376 So. 2d 1328, 1332 (Miss. 1979); ***Knox Glass Bottle Co. v. Underwood,*** 89 So. 2d 799, 813.

The Court specifically found that Barnes and Lampkin did not act in any improper manner, whether intrinsically unfair or otherwise, toward Fortenberry or EM&N, and that Lampkin's opinion that a suit was not necessary or desirable did not constitute an unfair treatment of Fortenberry or EM&N. He based this conclusion on many facts. He was convinced that had BTL's business turned around that the debt to EM&N would have been paid. Further, he found that it would have been to Barnes

and Lampkin's advantage for the debt to be paid, because they had to use their personal funds to make the payments on the note to the bank. In addition, he found that Barnes had basically bankrupted himself in trying to keep BTL afloat, and that the cash contributions he made were used to pay current obligations, not long-term debt. His cash simply kept the doors open a little longer. He also found that the reason for not paying the debt was simply because BTL did not have the money to pay.

At the time Fortenberry made the motion to sue BTL on the debt, Barnes and Lampkin were doing all they could to turn the financial state of the company around. At that point, they still believed it possible. They knew there was no money to be had from a lawsuit. Their idea was to turn BTL around and then to pay the debt to EM&N. Their action can not be characterized as "inherently unfair" at the time that it was taken. At the time BTL was operating, Barnes and Lampkin were trying to turn it around. If this had happened, all of the evidence supports the conclusion that the debt would have been paid.

Barnes and Lampkin did not breach their fiduciary duty to EM&N by failing to pursue collection of the BTL debt.

### III. ARE BARNES AND LAMPKIN PERSONALLY LIABLE TO FORTENBERRY FOR BREACHING THEIR FIDUCIARY DUTY OF "STRICT GOOD FAITH" ARISING FROM THEIR RELATIONSHIP AS SHAREHOLDERS IN A CLOSELY HELD CORPORATION?

Fortenberry contends it was beneficial for Barnes and Lampkin to refuse to sue BTL. However, if they had agreed to sue BTL, it is likely that the outcome would have been the same. EM&N still would not have been paid because there was no money in BTL to pay anything other than current obligations. The money that was in BTL was contributed by Barnes. He certainly did not benefit by sinking over $600,000 into a failing company. He and Lampkin both lost their $20,000 worth of equity in EM&N just as Fortenberry did. Everybody lost. There was no evidence that Barnes and Lampkin gained or profited from the absence of suit against EM&N. The chancellor reasoned that shareholders are not forbidden from acting on divergent opinions. *Fought v. Morris*, 543 So. 2d 167 (Miss. 1989), forbids intrinsically unfair behavior that breaches a duty flowing from one shareholder to the corporation or to other shareholders. The lower court found that the actions of Barnes and Lampkin, as shareholders of EM&N, falls short of being intrinsically unfair.

### CONCLUSION

Barnes and Lampkin did not breach their fiduciary duties to Fortenberry or EM&N. Further, they, as controlling shareholders in a closely held corporation, did not act intrinsically unfairly toward Fortenberry and, therefore, should not be held personally liable to him. The chancellor did not misapply the law based on these facts, and therefore did not err. His decision is affirmed.

**AFFIRMED.**

**LEE, C.J., PRATHER AND SULLIVAN, P.JJ., BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**